464 So.2d 329 (1984)
ENGINEERED MECHANICAL SERVICES, INC.
v.
John M. LANGLOIS.
ENGINEERED MECHANICAL SERVICES, INC.
v.
APPLIED MECHANICAL TECHNOLOGY, INC. et al.
Nos. CA 83 1384, CA 83 1385.
Court of Appeal of Louisiana, First Circuit.
December 28, 1984.
Rehearing Denied February 21, 1985.
Writ Denied April 19, 1985.
*330 Bert K. Robinson, Baton Rouge, and N. Elton Dry, Houston, Tex., for Engineered Mechanical Services, Inc.
Carey Guglielmo, Baton Rouge, for Applied Mechanical Technology, Inc.; Gerald D. Whitehouse; A.J. McPhate; Ronald D. Hoover d/b/a Gonzales Manufacturing Inc.; Gonzales Manufacturing & Industrial Machines; Warmak, Inc.; and John Langlois.
Before COLE, CARTER and LANIER, JJ.
LANIER, Judge.
This is a suit in contract, tort and property rights by Engineered Mechanical Services, Inc. (EMS) seeking enforcement of employment contracts, protection for various trade secrets and ownership of a computer program. Named as defendants were John Langlois, Applied Mechanical Technology, Inc. (AMTEC), Gerald Whitehouse, A.J. McPhate, Richard Matula, Thomas Shelton, Dupree Maples, Charles Whitehurst, Ronald Hoover, Gonzales Manufacturing and Industrial Machine Works, Inc. (Gonzales), Warmak, Inc. and Louisiana State University (LSU).[1] Reconventional demands were filed by Langlois, AMTEC, Whitehouse, McPhate, Shelton, Maples, Whitehurst, Hoover and Gonzales. Prior to trial, Matula was dismissed from the suit and summary judgment was granted dismissing EMS's suit against Maples, Shelton and Whitehurst. After a trial on the merits, judgment was rendered dismissing EMS's claims, dismissing Langlois' reconventional demand, granting Whitehouse's reconventional demand against EMS for $2,633.15 and granting McPhate's reconventional demand declaring him the owner of the computer (engine analysis) program. McPhate's claim for money owing was denied. EMS took this suspensive appeal.

FACTS
In 1964, The Metalock Corporation[2] was formed by Chester Harris and his sons, *331 Cleon and Eddie, to operate a cold casting repair business. The repair procedure it employed was commonly known in the industry as "cold stitch" repair and involved the application of basic repair components called "metalace" (threaded dowel) and "metalock" (metal repair member) to mend metal casting cracks.[3] EMS originally started out repairing cracks in automotive engine blocks and cylinder heads. Within a year or two, EMS began taking on larger jobs and applying this cold stitch repair method to hydrogen compressors and acetylene compressors. EMS realized the potential application of this repair procedure to larger engine components and began hiring professional engineers as consultants. Through input from these engineers, research and development, and trial and error, EMS claims to have developed new engineering techniques and procedures for repairing large industrial-sized castings which are made of a chromium-molybdenum alloy (rather than cast iron) and which operate at significantly higher temperatures and pressures than cast iron. This technology has been applied by EMS to high temperature and pressure steam turbines (Trade Secret # 1) and natural gas compressors (Trade Secret # 2). EMS also claims to have developed a method for repairing original equipment manufacturer (O.E.M.) linerless compressor cylinders[4] (Trade Secret # 3).
Two of the engineers employed by EMS during this development stage were Gerald Whitehouse and A.J. McPhate. Whitehouse has a Ph.D. in mechanical engineering and was employed by LSU in 1966 as an assistant professor. In 1969, Whitehouse began consulting for EMS on a retainer basis. In 1975, he went on full time with EMS as vice-president and manager of the engineering division. At that time, Whitehouse signed an employment contract which contained confidentiality, noncompetition, and assignment of invention clauses.[5] Whitehouse's employment with EMS involved designing repair methods and writing job proposals. Whitehouse terminated his employment with EMS on July 31, 1976, and returned to LSU. He was kept on retainer by EMS until the end of 1976. In May of 1977, Whitehouse was asked to provide consulting services on another job for EMS, but he refused. He has not rendered any consulting services for EMS since 1976. In January 1977, Whitehouse had his first contact with Gonzales and was consulted, on a retainer basis, about the design of a trunnion. Since that time, Whitehouse has maintained a consulting relationship with Gonzales.
McPhate, a professor of mechanical engineering at LSU since 1962, was contacted by Whitehouse in the fall of 1972 for assistance on a job he was doing for EMS. As a result of this contact, McPhate developed the computer (engine analysis) program (Trade Secret # 4) to solve the problem. McPhate continued providing consulting services to EMS until 1977 but never signed an employment contract.
Another key employee of EMS during the development and application of these alleged trade secrets was John Langlois. Langlois was hired by EMS in June of 1974 to run the machine shop.[6] He was responsible for purchasing, oversaw the general upkeep of the company premises and maintained EMS's supplies and vehicles. In May of 1975, he signed an employment contract with EMS.[7] During his employment with EMS, he had access to EMS's customer file, shop drawings for repairs and job proposals. On December 15, 1977, Langlois terminated his employment with *332 EMS to accept a position with Gonzales.[8] Langlois' main responsibility with Gonzales was to solicit business. For two years after his termination with EMS, Langlois called on customers of both EMS and Gonzales; however, he did not call on any of EMS's customers who were not already customers of Gonzales. When Langlois left EMS, he did not make a compilation or list of EMS's customers to take with him to Gonzales.
Gonzales, a competitor of EMS, was founded in 1961 by Leon Hoover and was incorporated in 1963 as a general machine shop. In 1977, Ronald Hoover acquired ownership of Gonzales from his father. Before Langlois, Whitehouse and McPhate became associated with it, Gonzales had not repaired O.E.M. linerless compressor cylinders and had not done any repairs using the metalocking repair process.[9] After Langlois joined it, Gonzales started relining O.E.M. linerless compressor cylinders. In 1980, Gonzales began offering the metalocking repair process using technology made available by Whitehouse and McPhate.[10]
On March 24, 1980, AMTEC was incorporated to provide professional engineering support services for industry. The principals of AMTEC are Ronald Hoover, Donald Gunter (a Gonzales employee), Langlois and Whitehouse. AMTEC's principal client is Gonzales.[11] AMTEC secured the consulting services of McPhate, who agreed to make available to AMTEC his engine analysis program and a finite element analysis program.
Early in 1979, EMS learned that Gonzales was performing cylinder relining of O.E.M. linerless cylinders which it considered to be its trade secret. EMS then required all employees sign an employment contract or be terminated. About 20 employees refused to sign and were terminated. Some of these employees went to work for Gonzales. EMS then filed suit against Langlois. In 1980, EMS received information that AMTEC bid on a job (which EMS had also bid on) to repair a high temperature and pressure turbine case. The job required the exact same repair approach that EMS had used on its Kentucky Utilities job in 1975.[12] EMS was awarded the job over AMTEC. EMS filed a second suit in 1981 against the remaining above-named defendants. EMS claims that AMTEC and/or Gonzales have used its trade secrets on various jobs.

ISSUES RAISED ON APPEAL BY EMS
1. Did the trial court err in finding that EMS was under a duty to provide a specific "list" or like communication of its trade secrets to the applicable defendants?
2. Did the trial court err in finding that various EMS sales brochures disclosed to the public those things EMS considers trade secrets and that EMS thus had no protectable trade secrets?
3. Did the trial court err in mischaracterizing EMS's trade secrets and confidential information as experience acquired and as skill developed by the applicable defendants while employed by EMS?
4. Did the trial court err in finding that EMS did not own the engine analysis program?
5. Did the trial court err in denying EMS the right and opportunity to question W. Thomas Durbin, Jr. as a witness during presentation of its case-in-chief?

TRADE SECRETS LAW
By Acts 1981, No. 462 § 1 (effective September 11, 1981), Louisiana adopted the *333 Uniform Trade Secrets Act. La.R.S. 51:1431 et seq. Prior to the adoption of this Act, trade secrecy protection was provided for in La.R.S. 51:1405, which makes it unlawful to engage in "unfair" trade practices.[13]Lamb v. Quality Inspection Services, Inc., 398 So.2d 643 (La.App. 3rd Cir.1981); National Oil Service of Louisiana, Inc. v. Brown, 381 So.2d 1269 (La.App. 4th Cir. 1980). Determining what constitutes an unfair practice involves a balancing process between the right of the employee to individual freedom and the right of the employer to honest and fair competition and protection of business assets and property. Lamb, 398 So.2d at 645.
Beyond general disapproval of unfair competition, Louisiana statutory law was devoid of any definite guidelines for courts to follow in defining concepts of trade secrecy. For this reason, Louisiana courts, in the few instances where they have considered trade secrets, have relied heavily on common law decisions. Comment, Misappropriation of Trade Secrets, 53 Tul.L.Rev. 215 (1978); Martin and Springgate, Protection of a Businessman's Proprietary Information, 32 La.L. Rev. 497 (1972). As a creature of the common law, the law of trade secrecy protection has developed jurisprudentially. Barranger, Industrial Trade Secrecy in Louisiana, 43 Tul.L.Rev. 775 (1969). In a trade secrets case, the plaintiff has the burden of establishing both the existence of a legally protectable secret and a legal basis upon which to predicate relief. Comment, supra, at 216. The legal basis upon which relief and protection has been afforded consists of a conglomerate of property, agency, tort and contract law and on the concept of equity. Id. at 222-233; Martin and Springgate, supra, at 514; Barranger, supra, at 784.
The threshold inquiry in every trade secrecy case is whether a legally protectable trade secret exists in fact. Wheelabrator Corporation v. Fogle, 317 F.Supp. 633 (W.D.La.1970), aff'd, 438 F.2d 1226 (5th Cir.1971); Comment, supra, at 217. Various efforts have been made to define what is a "trade secret". Standard Brands, Inc. v. Zumpe, 264 F.Supp. 254 (E.D.La.1967); Lamb, 398 So.2d at 645. The Restatement of Torts, § 757, Comment B (1939) sets forth the commonly accepted definition of a "trade secret" as follows:
A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a machine or other device or a list of customers.
Wheelabrator Corporation, 317 F.Supp. at 636; Lamb, 398 So.2d at 645. Whether something constitutes a trade secret is a question of fact. Lear Siegler, Inc. v. Ark-Ell Springs, Inc., 569 F.2d 286 (5th Cir.1978).
If information is found in fact to be a protectable secret, it then becomes necessary to determine whether an express or implied contractual or confidential relationship exists between the parties which obligates them not to use or disclose the secret information. Comment, supra, at 242; Martin and Springgate, supra, at 530. Langlois and Whitehouse entered into employment contracts with EMS which contained noncompetition[14] and confidentiality[15] *334 clauses. McPhate did not enter into any such agreement with EMS. However, even in the absence of a restrictive covenant not to disclose confidential information, trade secrets will be protected where a confidential relationship exists. Wheelabrator Corporation, 317 F.Supp. at 637; Standard Brands, Inc., 264 F.Supp. at 262; Comment, Agreements Not to Compete, 33 La.L.Rev. 94 (1972); See also, Holliday, Jr. and Norman, Employment Contracts: A Checklist for the Draftsman, 31 La.B.J. 12 (1983). This rule is based on the principle that unfair methods of competition are against public policy and the agency principle that an employee (agent) has a duty not to use or communicate information given to him in confidence in competition with or to the injury of the employer (principal) unless the information is a matter of general knowledge. Standard Brands, Inc., 264 F.Supp. at 262; National Oil Services of Louisiana, Inc., 381 So.2d at 1273. Such a wrongful disclosure or use of a trade secret is considered a breach of trust or confidence.
In Great Lakes Carbon Corporation v. Continental Oil Company, 219 F.Supp. 468, 498 (W.D.La.1963), aff'd, 345 F.2d 175 (5th Cir.1965), the essential elements of a cause of action for breach of confidence were listed as follows:
(i) possession by the plaintiff of knowledge or information which is not generally known,
(ii) communication of this knowledge or information by the plaintiff to the defendant under an express or implied agreement limiting its use or disclosure by the defendant, and
(iii) use or disclosure by the defendant of the knowledge or information so obtained in violation of the confidence, to the injury of the plaintiff.

TRADE SECRETS CLAIM

(Issues 1, 2 and 3)
The district court, relying on Motorola, Inc. v. Fairchild Camera and Instrument Corp.,[16] 366 F.Supp. 1173 (Ariz.1973), found the following:

*335 There was no evidence that The Metalock Corporation/EMS ever communicated to any of the applicable defendants what it considered as trade secrets. The evidence showed that through various sales brochures EMS disclosed to the public those things it now considers as being secret. (See D-3, 4, 5, 6, 18, 23, 24; P-28, 46.)
It is the conclusion of the Court that plaintiff's trade secret claims must fail. EMS contends the trial court erred in finding it was under a duty to provide the applicable defendants a specific "list", or like communication, of its trade secrets, in finding its various sales brochures disclosed to the public those things it considered trade secrets and in mischaracterizing its trade secrets as experience acquired and skill developed by the defendants while employed by it. EMS claims the following information is confidential (trade secrets):
1. Steam turbine repair process;
2. Compressor and engine configurations repair process;
3. O.E.M. linerless compressor cylinder relining process; and
4. Engine analysis program.[17]
Only two witnesses were presented by EMS on these issues: Cleon Harris and Dr. Douglas Muster. Cleon Harris gave specific testimony detailing what EMS considered to be its trade secrets, which is summarized as follows:
1. Steam turbine repair process:
(a) Design and application of interlocking bushing to repair cracked horizontal joint stud hole;
(b) Design and application of keylock repair component (Keylock II) to repair cracked case (including design considerations such as size, number, placement, installation, preload and material selection of the repair component);
(c) Design and application of preloaded masterlock;

(d) Pricing structure for steam turbine repairs (factors used in arriving at a hard dollar bid).
2. Compressor and engine configuration repair process:
(a) Discovery, through extensive research, of inherent manufacturing design defects in Cooper-Bessemer compressors;
(b) Design and application of tiebolts to repair cracks and reinforce these compressors (thereby remedying the problems caused by the inherent defects).
3. O.E.M. linerless compressor cylinder relining process:
(a) Engineering analysis results used in preparing compressor cylinders for relining;
(b) Design and application of z-shaped false seat valves.

Harris also testified that Langlois, Whitehouse and McPhate knew nothing about cold casting repairs when they began working for EMS, although Langlois did have machine shop experience.
Dr. Douglas Muster, a professor of engineering at the University of Houston, was offered by EMS as an expert on trade secrets in the area of steam turbine repair, large engine compressor repair and compressor cylinder relining. Defendants objected to Dr. Muster being accepted as an expert in this field because he had never designed or participated in any steam turbine or cylinder compressor repairs. The *336 trial court accepted Dr. Muster as an expert and considered the objection as going to the weight of the evidence. Concerning the steam turbine repair process, Dr. Muster testified that he has been involved with bushings since 1937 and he has never seen a bushing like EMS's interlocking bushing, which he considered to be very uniquely designed. He also considered Keylock II to be very unique in shape, dimension, materials used and in the application of preload to this repair member. As far as EMS's compressor and engine repair process was concerned, Dr. Muster considered EMS's discovery of the inherent defects in the Cooper-Bessemer compressors significant and the application of preloaded tielocks to fix this design flaw, even before cracks occurred, a novel development. Finally, as to EMS's compressor cylinder relining process, Dr. Muster opined that EMS's z-shaped false valve seat had the unique characteristic of being able to provide a fix in circumstances where it would be difficult to provide a fix otherwise and that the predetermined interference fit liners mechanically installed provided a unique feature in bringing liners back to original equipment dimensions.
Defendants countered this testimony about the uniqueness of EMS's repair processes with the testimony of Whitehouse and McPhate, both of whom have extensive education and experience in the field of mechanical engineering. Both Whitehouse and McPhate were involved with the various repair processes utilized by EMS. Their testimony concerning EMS's alleged trade secrets was basically very similar and is summarized as follows:
1. Steam turbine repair process:
(a) The interlocking bushing was not novel or unique from an engineering standpoint or from the way it was applied and utilized by EMS (McPhate did not think the utilization of the interlocking bushing in this manner was a good idea); Whitehouse never saw EMS use the interlocking bushing while employed there; finally, the interlocking bushing has been used only once by defendants on a job for LP & L in 1982 to replace one installed by EMS;
(b) The Keylock II was not novel or unique because it is merely a precision metalock which requires precision machining and is preloaded (this concept is demonstrated in a 1911 machinedrawing book, see D-30); the application and installation of this repair member is not unique (concepts of preload and shrink fit have been known for a long time); Whitehouse considered the "I" beam shape used by defendants better suited to high temperature repair than the dogbone shape utilized by EMS; finally, defendants have never used the Keylock II (although, conceptually, there is no difference between the "I" beam repair member and EMS's Keylock II);
(c) The design and application of a preloaded masterlock is not unique (concept appears in a 1942 patent issued to L.B. Scott);
(d) The optimum placement, number and size of the repair members is not a unique discovery by EMS because there was really no set way of making these determinations (each repair was handled on an individual basis according to the geometry and the space constraints imposed by each casing);
(e) The space-age material EMS claims to be using is unknown to defendants and no attempts have been made to find out what EMS uses;
(f) Any formula or tabulations used by EMS to calculate optimum preload for installing repair members is unknown to defendants (the preload applied varies from turbine to turbine); McPhate does not even know how EMS measures what is optimum;
(g) The pricing formula used by EMS is unknown to defendants; Whitehouse prices steam turbine repair jobs the standard way that any engineer would do it, and he was unaware of any formula that Harris used to price these jobs; McPhate was never involved in *337 pricing steam turbine repair jobs for EMS.
2. Compressor and engine configurations repair process:
(a) The design and application of tiebolts by EMS to Cooper-Bessemer compressors was not a unique or novel discovery (merely an engineering application of bolts which is referred to in most machine-design books); McPhate did not think that there was anything novel about drilling a hole through something with a crack in it and putting a long bolt on it and tightening it to close the crack;
(b) Preloaded tiebolts are not unique because preload is synonymous with a bolt.
3. O.E.M. linerless compressor cylinder relining process:
(a) Defendants were unaware of any written criteria that EMS used in deciding when a cylinder was capable of being relined (this decision had to be made independently on each and every cylinder depending on the wall thickness of each cylinder); this individual case by case determination on each cylinder is the procedure used by other machine shops, including Gonzales;
(b) The z-shaped false valve seat is not a unique discovery (it is merely a specific fix-up which is dependent on how much material can be bored out of the cylinder and still have it sustain the loads of the valve seating); the valve seat can be configured to match whatever material is remaining in the casting; McPhate was unaware of any criteria used by EMS in deciding to use a z-shaped, L-shaped or some other shaped valve seat;
(c) The predetermined interference fit liner is not a unique development because it varies in diameter with each cylinder; Whitehouse was unaware of any set guidelines concerning the interference fit utilized by EMS; the concept of utilizing interference fit in installing liners has been applied by other machine shops;
(d) Peening of radial dowels is not unique (McPhate described it as being no more novel than driving a nail into a board); peens have always been used as positioning devices and if there is a clean interference fit of the correct amount, peening becomes unnecessary; the concept of peening is contained in a machine design book that Whitehouse was teaching out of.
Whitehouse and McPhate did not consider any of the repair processes utilized by EMS as being unique or novel. Further, the record has other evidence which demonstrates EMS's processes were not unique discoveries or developments which it tried to keep confidential and secret. The processes utilized by EMS employed techniques and procedures which were matters of public knowledge that had been developed by others before EMS applied them to specific repair problems (every alleged trade secret involves modifications or adaptations of technology already on the market). Compare, Wheelabrator Corporation, 317 F.Supp. 633; Lamb, 398 So.2d 643. The district court apparently accepted the testimony and evidence submitted by the defendants, rejected that submitted by the plaintiff and found as a fact the processes and information for which the plaintiff sought protection were not trade secrets. After reviewing the record, we conclude this finding was not clearly wrong.
Accordingly, these assignments of error are without merit, and the judgment of the district court denying EMS trade secrecy protection is affirmed.

OWNERSHIP OF THE "ENGINE ANALYSIS PROGRAM"

(Issue 4)
In the fall of 1972, McPhate was consulted by Whitehouse for assistance in solving an engine crankshaft failure problem one of EMS's customers, Florida Gas Transmission Company, was experiencing with the same type engine in all of their transmission stations. Whitehouse and McPhate *338 first attempted to discover the problem using an instrumentation approach but were unsuccessful. McPhate then suggested a computer analysis be utilized in solving the problem.
A computer (engine analysis) program was developed by McPhate. It had 20 subprograms which made up 75% of the program. These subprograms previously had been developed by McPhate between 1968-1972 as a public service to LSU, were kept in the "public domain library" in LSU's computer system and were available to anyone who bought time on the LSU computer. The remaining 25% of the engine analysis program was specifically written by McPhate for the Florida Gas job. Once completed, simulation runs of the program were made, and a report was prepared and presented to Florida Gas. EMS only utilized the program on one other occasion, a job for Union Carbide in 1973.[18]
At trial, both EMS and McPhate claimed ownership or proprietary rights over the engine analysis program. The trial judge found that "McPhate owns all portions of the engine analysis program not previously placed in the public domain." On appeal, EMS concedes that it is not seeking ownership of the 75% of the program which is in the public domain. However, EMS contends that the trial court erred in not finding it the owner of the "engine analysis program", which is comprised of a combination of the 75% subprograms in the public domain together with the 25% software prepared specifically for EMS by McPhate to be utilized on the Florida Gas job.
EMS presented the testimony of Dr. Cecil Smith, who was accepted by the district court as an expert in the computer software industry. Dr. Smith testified that when software is used by one party but is written by another party, ownership of the software should be established at the very outset of the job by some form of license agreement or specific understanding clearly stating the proprietary rights of the two parties. The person writing the program is responsible for initiating any ownership agreement. In the absence of any such agreement, the person who pays to have the software developed would be the owner. Dr. Smith stated that EMS owns the engine analysis program because the software was specifically developed[19] for an EMS application on a job it was doing, EMS clearly paid for the work done and had reused the software in other applications, EMS was not denied access to the use of the program and McPhate failed to communicate very clearly before the software was written that he retained ownership. Further, although McPhate always kept and maintained possession of the engine analysis program, physical possession does not necessarily pertain to ownership. EMS offered additional evidence that in the proposals presented to Florida Gas, Union Carbide and Exxon, it claimed ownership rights to the engine analysis program.
Whitehouse testified that during his discussions with Cleon Harris about the use of a computer program to solve Florida Gas' problem, Harris never requested ownership, possession or a copy of the engine analysis program. Although several proposals written by Dr. Whitehouse for EMS claimed ownership of the engine analysis program by EMS, he "never really felt that EMS truly owned the program because I didn't think they paid for it. They did not pay for the development of the program." Reference to EMS as owner of the engine *339 analysis program was merely a sales tool used to let customers know that EMS had access to the program. In further support of this belief, Whitehouse asked McPhate for permission to advertise and use the program when needed on behalf of AMTEC, and McPhate agreed. Whitehouse admitted that neither he nor AMTEC had any ownership of the engine analysis program and that neither has ever used the program, except in an advertising mode.
McPhate testified that he never had any discussions with Harris about ownership or proprietary rights over the engine analysis program. He considered the program as an asset and source of revenue of Warmak, Inc.,[20] and charged EMS rent, through Warmak, Inc., for use of the engine analysis program. McPhate opined that LSU owns 75% of the program and he owns the 25% specifically written for the Florida Gas job. He based this opinion on the fact that he did not charge for and EMS did not pay him for the software itself; all EMS was billed for and all it paid for was the use and results of the software program. The program was utilized by EMS only on the Florida Gas and Union Carbide jobs. In both instances, McPhate only billed EMS for use of the software and never made a charge for the sale of any computer software.[21] Further, he was unaware, until after this lawsuit was filed, that Harris had made reference to EMS as owner of the engine analysis program in its proposals. Finally, McPhate testified that he never prepared a user's manual for the engine analysis program. It would have taken McPhate two weeks to prepare a 50 page manual in order to render the program usable by others. Without such a manual, the program was useless to EMS.
Although there was no clear understanding or agreement between EMS and McPhate concerning the ownership of the engine analysis program, the evidence sufficiently establishes McPhate had no intention of vesting EMS with ownership or proprietary rights in the program. This intention was manifested by McPhate to EMS in a number of ways: (1) McPhate always retained possession of the program and was never asked for nor did he ever give a copy of the program to EMS; (2) the invoices submitted to EMS by McPhate for his services indicate that he was charging for program use and was not selling the program to EMS; and (3) McPhate's failure to prepare a user's manual is an indication he intended to retain ownership.
The district court's factual finding that McPhate owns the portion of the engine analysis program (25%) not placed in the public domain is not clearly wrong and is affirmed.

TESTIMONY OF W. THOMAS DURBIN, JR.

(Issue 5)
During the presentation of its case-inchief, EMS attempted to call W. Thomas Durbin, Jr. as a witness on direct examination. Defendants objected to this testimony arguing that Durbin was not listed as one of EMS's witnesses in the pretrial order. The pretrial order, in pertinent part, states the following:
10. Plaintiff's Witnesses:

....
(5) Any witness listed by defendant, under cross-examination
....
11. Defendant's Witnesses:

....
(2) W. Thomas Durbin, Jr: Concerning factual issues relevant to this case;
EMS contends it was their intention to be able to call any witness listed by defendants under cross-examination.
The trial judge sustained defendants' objection to calling Durbin on direct since he was not listed as one of EMS's witnesses in the pretrial order. EMS was *340 given the opportunity to attempt to qualify Durbin as an adverse witness under crossexamination, but the district judge ruled that EMS failed to do so. La.C.C.P. art. 1634. Thus, EMS was precluded from calling Durbin on direct or cross-examination on its case-in-chief[22].
EMS argues the trial judge erred in denying it the right to question Durbin on direct during its case-in-chief. However, this court need not address the substance of this issue because EMS failed to properly preserve this issue for appellate review.
When the trial judge rules testimony of a witness inadmissible, a proffer (offer of proof) can be made. La.C.C.P. art. 1636. It is incumbent upon the party who contends his evidence was improperly excluded to make a proffer, and if he fails to do so, he cannot contend such exclusion was error. Grusich v. Grusich, 447 So.2d 93 (La.App. 4th Cir.1984); Jeffers v. Amoco Production Company, Inc., 405 So.2d 1227 (La.App. 1st Cir.1981).
In the instant case, EMS made no attempt to proffer Durbin's testimony. Since EMS failed to avail itself of the opportunity to proffer this testimony, it cannot now complain. Canty v. Terrebonne Parish Police Jury, 397 So.2d 1370 (La. App. 1st Cir.1981), writ denied, 401 So.2d 988 (La.1981).
This assignment of error is without merit.

DECREE
For the foregoing reasons, the judgment of the district court is affirmed at the appellant's costs.
AFFIRMED.

APPENDIX A

EMPLOYMENT CONTRACT
KNOW ALL MEN BY THESE PRESENTS that The Metalock Corporation, a corporation represented herein by its duly authorized President, Cleon B. Harris, hereinafter referred to as "Employer" and G.D. Whitehouse, of lawful age, sometimes hereinafter referred to as "Employee," for and in consideration of mutual and binding considerations herein expressed, do hereby agree as follows:
WHEREAS Employer and its subsidiaries are engaged in the United States and other countries in work involving the repair of metals, and engineering related thereto, and in the business of repairing compressors, and selling cylinder heads, and in related fields, and in research, development, construction, manufacture, formulation, purchase, sale, distribution, use and other activities in connection with metals, and in the course of the business Metalock maintains accounting, cost, research, development, sales and other records as well as lists of customers, and Metalock follows various procedures and practices in connection therewith (any one or more or combination of the foregoing activities hereinafter referred to as the "business of Employer"); and
WHEREAS Employer and its subsidiaries depend to a substantial extent upon maintaining strict secrecy with respect to the trade secrets and other confidential information relating to the business of Employer, (hereinafter individually and collectively referred to as "Confidential Information") and Employee has acquired or had access to or may acquire or have access to Confidential Information of Employer during the course of his employment;
NOW, THEREFORE, the parties agree as follows:

I.
Employer hereby employs or continues the employment of Employee, and Employee accepts such employment or continued employment, as the case may be, at such compensation as is presently, or may hereafter be, mutually agreed upon from time to time, subject to each of the terms and conditions hereinafter set forth in this Agreement. Without impairment of any *341 other rights of either party hereto to terminate the employment hereunder, the employment of Employee may be terminated by either party upon at least thirty (30) days prior written notice to that effect given to the other party. Employee shall devote his entire working time for, or at the direction of, Employer during the period of his employment and shall devote his best efforts to such duties as may reasonably be assigned to him. Employee shall faithfully and diligently serve and endeavor to further the interests of Employer during the period of his employment, and Employee shall not act directly or indirectly in any advisory or other capacity for any firm, individual or corporation other than Employer, or hold any stock or ownership interest of any nature in any competing business. Employee hereby recognizes that Employer is the sole and exclusive owner of the trademark and trade name "METALOCK." Employer agrees to teach Employee skills, and to give Employee knowledge of the processes and trade secrets of Employer and to teach Employee special selling techniques and to give Employee access to the unique information necessary for efficient utilization of Employee's skills in this unique industry, and to give Employee access to Employer's confidential files and lists of Employer's customers and potential customers, as the need may arise.

II.
Employee shall use his best efforts and exercise utmost diligence to protect and guard the Confidential Information of Employer and each of its subsidiaries. Neither during his employment by Employer nor thereafter shall Employee directly or indirectly use for himself or another, or disclose to another, any Confidential Information (whether or not acquired, learned, obtained or developed by Employee alone or in conjunction with others), of Employer or any of its subsidiaries, except as such disclosure or use may be required in connection with employment under this Agreement or may be consented to in writing, prior to its use, by Employer. Employee shall deliver promptly to Employer at the termination of his employment, or at any other time Employer may request, without retaining any copies, notes or excerpts thereof, all memoranda, diaries, notes, records, plats, sketches, plans, specifications, customer lists, or other documents relating, directly or indirectly, to any Confidential Information, made or compiled, or delivered or made available to, or otherwise obtained by Employee. Each of the foregoing obligations of Employee in this paragraph II shall also apply with respect to confidential information of customers, prospective customers and others with whom Employer or any of its subsidiaries has a business relationship, whether learned or acquired by Employee during the course of his employment by Employer. The parties specificially agree that the provisions of this Article II shall continue in full force and effect after termination of Employee's employment, whether such termination is in accordance with this Agreement or for any reason whatsoever, with or without cause, whether voluntary or involuntary.
Employer and Employee specifically agree, as one of the essential elements of this Agreement, that once Employee has access to the unique knowledge that will be imparted to Employee pursuant to this contract, Employee's knowledge and services will be unique and the provisions of this Paragraph may be enforced by injunction, in addition to any other legal remedies as may be appropriate.

III.
Employer and Employee agree that any and all inventions, improvements, discoveries, formulas or processes relating to the business of Employer invented, discovered or learned by Employee during the term of his employment shall at once be fully disclosed by him to the president of Employer and it shall be the sole and absolute property of Employer and Employer shall be the sole and absolute owner of all patents and other rights in connection therewith, and Employee agrees to do all things reasonable and/or necessary to obtain letters patent *342 in the name of Employer, and without further additional compensation, but said patents to be acquired at the expense of Employer.

IV.
For a period of two (2) years after the expiration of this Agreement, Employee obligates himself not to engage directly or indirectly as principal, agent, advisor, stockholder, consultant or employee in any business in competition with Employer in any area of the United States in which Employer is engaged in business. Nothing contained herein shall, however, prevent Employee, upon termination of this Agreement, from engaging anywhere in any occupation in which the knowledge given to Employee by Employer (by way of example, but not limitation, the names of customers or potential customers, processes, formulas or other Confidential Information, will not be indirectly or directly involved to the detriment of Employer). Employee agrees, at the termination of this Agreement, that for a period of two (2) years he will not directly, nor shall he indirectly, endeavor to induce customers or employees of Employer to do business with any competitor of Employer, nor shall he induce any other employee of Employer to leave Employer's employment.
For the purposes of this paragraph IV, Employer and Employee agree that it would be very difficult to ascertain the exact amount of damage that would be caused to Employer by Employee's breach of this noncompetition agreement. The parties therefore specifically and voluntarily agree that should Employee breach this noncompetition agreement, liquidated damages shall be owed and paid by Employee in the sum of $200.00 per calendar day for each day that the noncompetition agreement is breached, together with legal interest from the date of breach, together with Employer's reasonable attorney's fees.
The term "subsidiary" as used in this agreement means any corporation, partnership, joint venture or other type of business organization or entity in which Employer now or hereafter directly or indirectly controls or owns at least fifty (50%) percent interest.
Any waiver of any part of this Agreement shall not constitute a waiver of any other part; nor shall failure to enforce any part of this Agreement be construed as a waiver of any other part of this Agreement; nor shall a waiver of any breach of this Agreement, or any part of it, constitute a waiver of any succeeding breach.
Subject to Paragraph I hereof, this Agreement constitutes the entire Agreement and understanding between Employer and Employee with respect to employment, and all prior negotiations and understandings are merged herein and superseded. No amendment of this shall be valid or of any force and effect unless in writing signed by Employer and Employee. This Agreement is nonassignable by Employee and shall be binding upon Employee and shall bind his heirs, personal representatives, executors, administrators and assigns, and this Agreement shall inure to the benefit of Employer, its successors and assigns.
IN WITNESS WHEREOF, the parties have executed this Agreement in duplicate originals as of the 15th day of May, 1975.
/s/ G.D. Whitehouse
G.D. Whitehouse
 THE METALOCK CORPORATION
 By: /s/ Cleon B. Harris
 Cleon B. Harris, President
 /s/ Carolyn L. Harris
 Carolyn L. Harris, Sec.-Treas.
WITNESS:
/s/ Nancy B. Dawson
/s/ Sheryl Barnett
STATE OF LOUISIANA
PARISH OF EAST BATON ROUGE
BEFORE ME, the undersigned Notary Public, personally came and appeared: CLEON B. HARRIS, who being first duly sworn did depose and say that he is the President of The Metalock Corporation and he has executed the above and foregoing *343 Employment Contract in that capacity on this 21st day of May, 1975.
 /s/ Bert K. Robinson
 Bert K. Robinson, Notary Public
NOTES
[1] EMS originally filed two separate suits against the various defendants: suit # 226,748 was filed July 30, 1979, against Langlois and suit # 243,108 was filed January 19, 1981, against the remaining defendants. These two suits were consolidated for trial on July 8, 1982.
[2] EMS was incorporated in 1975 by Cleon Harris as the successor of The Metalock Corporation. For sake of simplicity, the Metalock Corporation also will be referred to hereinafter as EMS.
[3] This cold stitch repair method had traditionally been applied only to cast iron castings, such as automobile engine blocks.
[4] These compressor cylinders are manufactured without a liner which, prior to its discovery, EMS claims were "throwaway" items once the lining was worn out from use.
[5] Whitehouse's employment contract is attached as Appendix A.
[6] Before being hired by EMS, Langlois had been previously employed by Gonzales for three years as assistant manager.
[7] This employment contract was identical to the one signed by Whitehouse. See Appendix A.
[8] Langlois also was given a 10% ownership interest in Gonzales.
[9] Gonzales did repair turbine case cracks using a welding process.
[10] Gonzales used newly designed "I" shaped repair members to repair cracked steam turbine cases rather than the lobed or "dogbone" repair members (Keylock II) used by EMS. Keylock II was never patented by EMS.
[11] AMTEC was advertised as a subsidiary of Gonzales, although no such relationship existed.
[12] Langlois, Whitehouse and McPhate were involved in the Kentucky Utilities job.
[13] The existence of trade secrets is recognized in La.C.C.P. art. 1426(7).
[14] The trial court held that the noncompetition clauses in both Langlois' and Whitehouse's contracts were invalid because of EMS's failure to comply with the requirements of La.R.S. 23:921 (EMS failed to prove that it incurred any expenses in training or advertising Langlois and Whitehouse). This holding has not been challenged on appeal by EMS. La.R.S. 23:921 provides as follows:

No employer shall require or direct any employee to enter into any contract whereby the employee agrees not to engage in any competing business for himself, or as the employee of another, upon the termination of his contract of employment with such employer, and all such contracts, or provisions thereof containing such agreement shall be null and unenforceable in any court, provided that in those cases where the employer incurs an expense in the training of the employee or incurs an expense in the advertisement of the business that the employer is engaged in, then in that event it shall be permissible for the employer and employee to enter into a voluntary contract and agreement whereby the employee is permitted to agree and bind himself that at the termination of his or her employment that said employee will not enter into the same business that employer is engaged over the same route or in the same territory for a period of two years.
[15] Confidentiality agreements have been held enforceable and not subject to the prohibition (and requirements) of La.R.S. 23:921. National Oil Service of Louisiana, Inc. v. Brown, 381 So.2d at 1273; Comment, Agreements Not to Compete, 33 La.L.Rev. 94 (1972); See also, Johnson, Developments in the Law, 1979-1980: Obligations, 44 La.L.Rev. 358 (1981).
[16] The passage from Motorola quoted by the district judge in his reasons for judgment is as follows:

`The following general guiding principles as to the law of trade secrets may be stated:
`If ... it appears that there were in fact no trade secrets or data [so treated], ... then no grounds for an injunction exists.
`In every case where the plaintiff seeks protection for a trade secret, it must appear that it really is secret. If a so-called secret process is known to others in the trade, no one will be enjoined from disclosing or using it.
`A substantial element of secrecy must exist, so that, except by the use of improper means, there would be difficulty in acquiring the information.
`Matters of public knowledge or if general knowledge in an industry cannot be appropriated by one as his secret.' (p. 1184)
....
`While the Motorola employee-defendants had executed the above-mentioned nondisclosure agreement, they were not advised upon execution, either generally or specifically, what, if any, production processes, know-how, or other things plaintiff considered proprietary. At no time during their employment were they so advised. Upon their termination attention of each was called to the existence of the trade-secret agreement. Even in view of the knowledge by plaintiff that they were accepting employment with a competitor, however, they were not advised either generally or specifically what plaintiff considered to be covered by the restrictive nondisclosure agreement. Indeed, the conclusion is inevitable that Motorola did not know what it so considered. The evidence established that there was no list or index of any kind in existence in Motorola's records, or in the records of their learned patent counsel who was privy to all their patent and alleged trade-secret information, as to what plaintiff considered to be a proprietary trade secret.
* * * * * *
`The same principle of unique burden and overbreadth would seem to apply to the contract here so as to make it unenforceable without specific advice at some time to employees as to specific trade secrets claimed or some evidence (of which there was none here) from which the Court could find that the employee should know a secret of which his employer did not specifically advise him.' (p. 1185)
[17] The engine analysis program will not be discussed in this section but will be specifically addressed later in the opinion.
[18] Cleon Harris claims to have offered to sell the engine analysis program results to several companies, including a proposal made to Exxon, but there is no evidence that EMS actually utilized the program on any other jobs.
[19] In his written reasons for judgment, the trial judge stated that "[t]he Court does not find that Dr. Smith's opinion is valid in the instant case since Dr. Smith was not aware of the prior existing software that was used by McPhate." The trial judge was incorrect in this finding since Dr. Smith specifically testified that he was aware from McPhate's testimony that he "had to write about 20 percent special from EMS. So from that, one concludes that apparently 80 percent of it pre-existed in some form or other." Although Dr. Smith was incorrect in the exact amount of the program that was already in existence, he was aware that prior existing software was used by McPhate.
[20] Warmak, Inc. is a corporation formed by McPhate and Frank Warner in February of 1972, through which McPhate did computer programming work and billed his services.
[21] Exhibits P-92 and 115.
[22] The trial judge did allow EMS to call Durbin as a rebuttal witness.