hWILLIAMS, Judge.
The plaintiff, Faris Wyatt, acting in her capacity as administratrix of the succession of her deceased daughter, Lisa Myers Stevenson, appeals the trial court’s denial of injunctive relief based on its finding that she failed to prove unfair trade practices by the defendant, Patricia H. Voorhies. We affirm.

FACTS

Patricia H. Voorhies and Lisa Myers Stevenson each owned 50% of the stock in P02, Inc. (“P02”), a corporation which distributes and maintains home medical supplies, particularly oxygen. Voorhies was president and Stevenson was secretary/treasurer. P02 acquired clients by referral from health care providers and facilities. Voorhies, a certified respiratory technician, also learned of patients through her employment at a local hospital.
Stevenson died in October, 1990. Subsequently, Faris Wyatt, Stevenson’s mother and administratrix of her succession, was appointed to the Board of Directors of P02. Voorhies continued to operate P02 with the assistance of her husband, Jeffery Wayne Voorhies, and other employees. Wyatt did not become involved in the operations of P02. In September, 1993, Voorhies began discussions with Wyatt regarding the purchase of Stevenson’s interest in P02, indicating that if they were unable to negotiate a buy out by the end of the year, she and her *361 husband would leave P02. were unsuccessful. The negotiations
In December, 1993, Voorhies and her husband established Fresh Air Medical Equipment, Inc. (“Fresh Air”). Jeffery Voorhies left his employment with P02 in January, 1994. Patricia Voorhies resigned as director, officer, and employee of P02 effective February 14, 1994. Two other P02 employees, Scott Swilley and Peggy Mercer, also resigned and went to work for Fresh Air. After Voorhies’ resignation from P02, her husband and Swilley, personally solicited P02 clients to transfer service to Fresh Air. In addition, advertisements for Fresh Air were run in the newspaper. Approximately 75 percent of the former P02 clients who transferred to Fresh Air did so as a result of the personal solicitation.
|2Wyatt filed suit against P02 and Patricia H. Voorhies, alleging that she was entitled to damages, mandamus, and injunctive relief because Voorhies’ diversion of P02 clients to Fresh Air constituted unfair trade practices. At the conclusion of the hearing on the request for a preliminary injunction, the trial court found that Wyatt failed to prove unfair trade practices and denied her request for injunctive relief. Subsequently, Wyatt unsuccessfully applied to this court for a supervisory writ.[1] Wyatt now appeals.

DISCUSSION

Wyatt contends the trial court erred in finding that Voorhies’ use of confidential information gained in her capacity as an officer, director and employee of P02 did not constitute unfair trade practice within the meaning of the Unfair Trade Practices and Consumer Protection Law.
The Unfair Trade Practices and Consumer Protection Law, LSA R.S. 51:1401, et seq., enacted in 1972, declares that “[ujnfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce” are unlawful. LSA R.S. 51:1405(A). However, the definition of unfair trade practices has been left to the courts. What constitutes unfair competition is determined on a case by case basis. Conduct is considered unlawful when it involves “fraud, misrepresentation, deception, breach of fiduciary duty, or other unethical conduct.” Core v. Martin, 543 So.2d 619 (La.App. 2d Cir. 1989); Dufau v. Creole Engineering, Inc., 465 So.2d 752 (La.App. 5th Cir.1985), writ denied, 468 So.2d 1207 (La.1985). “A practice is unfair when it offends public policy and when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.” Dufau, supra, citing Coffey v. Peoples Mortgage & Loan of Shreveport, Inc., 408 So.2d 1153 (La.App. 2d Cir.1981).
In determining what constitutes unfair competition, the court must balance the right of the employee to individual freedom on the one hand and the right of the employer to honest and fair competition and to protection of business assets and property in the |3nature of trade secrets on the other hand. National Oil Service of Louisiana, Inc. v. Brown, 381 So.2d 1269 (La.App. 4th Cir.1980). Generally, however, in the absence of a contrary agreement, an employee is free to compete with a former employer. National Oil, supra. In an employer’s claim against a former 'employee alleging misappropriation of a customer list, the following factors are considered: “the manner in which and the purpose for which the customer lists are compiled; the conduct and motivation of the employee before and after the employment relationship ends; the manner in which the customers are contacted after the termination; the nature of the representations made to the customers by the former employee; and, the existence of a scheme or an intent to injure or to take over all or a substantial part of the former employer’s business.” Core, supra, citing National Oil, supra.
Wyatt testified that she was not provided with a customer list or an inventory list for P02, but was told by Voorhies that the information was on the P02 computer. Wyatt presented a witness with some computer familiarity who testified that deletions had been made from the P02 computer; however, other than a word processing program, he *362 could not specify what had been deleted or when any deletions had occurred. He further testified that he was unable to locate a comprehensive list of customers on the P02 computer. Wyatt testified that she had compiled lists from three folders of P02 billing information and a ledger. She further testified that Fresh Air had taken 85 to 90 percent of P02’s business. A letter from Fresh Air to P02 regarding P02 clients who had transferred service to Fresh Air was introduced by Wyatt at the hearing; it identified 31 clients. Wyatt also testified that a code book which describes equipment and a machine used to test equipment were missing. According to Wyatt, P02 equipment was left in a state of disrepair.
Yoorhies testified that the bulk of P02’s income came from clients to whom it provided oxygen equipment and that at the time she resigned from P02, there were approximately thirty-five to forty of these clients. She testified she did not know the number of clients to whom P02 provided other types of medical equipment. Voorhies ^acknowledged that the names of the patients in need of such equipment are not a matter of public record. She testified that she became aware of the patients both through her work as a respiratory technician at the local hospital and through her position at P02. Yoorhies further testified that there was no comprehensive list of P02 clients either in writing or in the computer. She acknowledged that she had removed her personally owned word processing program from the P02 computer, but she denied having deleted or taken P02 client records. Voorhies testified that she did not solicit P02 employees to work for Fresh Air. She further testified that neither she, her husband, nor the other former P02 employees solicited any P02 clients to transfer to Fresh Air prior to her resignation from P02. Voorhies denied having taken any supplier list, documentation which would allow her to identify P02 clients, or any equipment.
Jeffery Voorhies testified that after his wife’s resignation from P02, he visited clients he knew from his previous employment with P02. He indicated he also knew some of these individuals outside his P02 employment. According to Mr. Voorhies, he did not visit P02 clients that he did not personally know. Mr. Voorhies testified that he did not know the addresses of the clients he solicited, but relied on his memory of their locations. He further testified that he explained to the clients he was no longer with P02, that he now worked with Fresh Air, and that it was the clients’ choice as to which business provided their service. He denied any knowledge of the allegedly missing code book and its whereabouts. Mr. Voorhies also denied any involvement with the P02 computer.
Peggy Mercer, the former P02 office manager, testified that she was not solicited to leave P02, but that she asked to go to work for Fresh Air. She indicated that the P02 computer was not set up to print a comprehensive client list. Mercer acknowledged that Voorhies’ word processing program had been removed from the computer. She further testified that she and Swilley loaded a government electronic billing program into the computer, viewed it, and removed it. Mercer testified that she took no documentation from P02 and saw no one else take any. She indicated that Fresh Air now has about Ueighty to ninety pex*cent of P02’s oxygen equipment clients. She also indicated that about seventy-five percent of those who transferred did so as a result of personal visits by Jeffery Voorhies and Scott Swilley.
The trial court concluded that Wyatt failed to prove the existence of a confidential “customer list” or that Voorhies or any of the former P02 employees removed or deleted any patient records. It found that all solicitation of P02 clients by former employees was done after Voorhies resigned from P02. After reviewing the record in its entirety, we conclude that the trial court’s findings are adequately supported by the evidence and absent a showing of manifest error, his findings of fact will not be disturbed on appeal. Arcenecaux v. Domingue, 365 So.2d 1330 (La. 1978). The trial court had the opportunity to observe the witnesses, and apparently believed the defendant and her witnesses. When a factfinder’s determination is based on its decision to credit the testimony of one or more witnesses, that finding can virtually *363 never be clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989).
Applying the jurisprudential factors cited in Core to the instant case, we note that no comprehensive P02 customer list was found to exist. Voorhies, apparently successfully, ran P02 from its establishment in May, 1988 until her resignation in February, 1994. Wyatt was, essentially, put on notice in September, 1993 that Voorhies and her husband would leave P02 at the end of 1993 if buy out negotiations were not successful. There is no evidence that Voorhies was deceptive in this regard. Yet, Wyatt made little or no effort to familiarize herself with the operations of P02. There is no evidence that Voorhies or other former P02 employees solicited P02 customers for Fresh Air until after the effective date of Voorhies’ resignation. At that time, P02 clients were solicited based on memory. The evidence does not show any misrepresentations by the former P02 employees to the P02 clients. Fresh Air ultimately gained thirty-one of P02’s thirty-five to forty more lucrative oxygen equipment clients; twenty-five percent of these transferred as a result of newspaper advertisement and seventy-five percent as a result of personal solicitation. While the seventy-five percent (23 clients or 58-66 ^percent of P02’s oxygen equipment clientele, according to our calculations) represents a substantial part of P02’s former oxygen equipment clientele, this fact, alone, is not sufficient to establish the existence of a “scheme or intent” to injure or take over the business of PO2. Core, supra; National Oil, supra. After reviewing the record in its entirety, we cannot say that Voorhies’ conduct offends public policy or constitutes an unfair trade practice.
Wyatt also failed to establish that the identities of P02’s clients constitute a trade secret under the Uniform Trade Secrets Act, LSA R.S. 51:1431 et seq., enacted in 1981, which defines trade secret:
“Trade secret” means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
(a) derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and
(b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.
LSA-R.S. 51:1431(4). Whether something constitutes a trade secret is a question of fact. Engineered Mechanical Services, Inc. v. Langlois, 464 So.2d 329 (La.App. 1st Cir. 1985), unit denied, 467 So.2d 531 (La.1985). The plaintiff in a trade secret case bears the burden of proving “both the existence of a legally protectable secret and a legal basis upon which to predicate relief.” Engineered Mechanical Services, supra.
Most importantly, no evidence was presented to show that the identity of P02’s clients was the subject of any efforts to maintain its secrecy. The P02 computer, for example, had no access code to restrict entry. There was no evidence of any contractual agreements regarding confidentiality of P02 information or restricting competition in the instant record. Whether Wyatt established a legally protectable trade secret is a question of fact. After reviewing the record, we cannot say that the trial court’s conclusion that she did not meet her burden of proof is clearly wrong.

CONCLUSION

For the foregoing reasons, we conclude that the trial court was not manifestly erroneous in its determination that Wyatt failed to prove unfair trade practices on the part of the defendants. The judgment is affirmed with all costs assessed against Faris Wyatt.
AFFIRMED.

. Fans Wyatt v. PO2, Inc. and Patricia H. Voor-hies, 26,628-CW (La.App. 2d Cir. 05/19/94).