631 So.2d 1389 (1994)
CORROSION SPECIALTIES AND SUPPLY, INC. and Kevin Crochet
v.
Richard DICHARRY, Jr., Mike Glore, Southern Precision, Inc. and Southern Machinery Sales, Inc.
No. 93-CA-196.
Court of Appeal of Louisiana, Fifth Circuit.
February 9, 1994.
Writ Denied March 25, 1994.
*1390 Skye McLeod, Susan J. Burkenstock, Gelpi, Sullivan, Carroll & Gibbens, New Orleans, for defendants/appellants.
Daniel R. Martiny, Lee, Martiny & Caracci, Metairie, for plaintiffs/appellees.
Before GAUDIN, GRISBAUM and CANNELLA, JJ.
CANNELLA, Judge.
Plaintiff, Kevin Crochet, and his company, Corrosion Specialties and Supply, Inc. (Corrosion), filed suit against defendants, Richard Dicharry, Jr., Mike Glore, Southern Precision, Inc. and Southern Machinery Sales, Inc., for preliminary and permanent injunctive relief, for damages for breach of contract and breach of fiduciary duty and for violations of the Uniform Trade Secrets Act and the Unfair Trade Practices Act. The case arises from an alleged agreement between Crochet and defendants for the manufacture and distribution of certain bellows sealed globe valves. After a hearing, the trial court granted a preliminary injunction, enjoining defendants from "manufacturing, selling, marketing, displaying and/or distributing the valves made the subject of these proceedings, including but not limited to the `Star' and/or (`SMS') valve." Defendants appealed and, for the following reasons, we affirm.

FACTS
Since the late 1980's, Crochet, through his company, Corrosion, has been the sole United States distributor of an unpatented globe valve, manufactured by Strack, Inc. (Strack), a German corporation. Due to the fluctuating currency exchange rate and difficulties with product delivery, Crochet began thinking of the possibility of having the valve manufactured in the United States. He proposed to Strack that they enter into a joint venture. However, Strack rejected his proposal. Crochet then decided to distribute the valve himself and he began searching for a manufacturer to produce the valve.
In the latter part of 1991, Crochet approached defendants and requested that they manufacture the valve for him. Crochet provided defendants with design drawings of four valves of various sizes and also the valves themselves. Crochet also provided defendants with the names of his customers and other information that he had gathered while distributing the valves for Strack. In addition, he provided information on modification of the valves to allow conformance with governmental specifications. Defendants proceeded with the design and drafting of the plans necessary to manufacture the valves. During this time, defendants and Crochet were involved in oral negotiations concerning the manufacture and distribution of the valves. The negotiations ceased when *1391 the parties could not agree on the various terms involved. However, defendants continued to proceed with designing and manufacturing the valves.
On September 17, 1992, Crochet instituted the present suit for injunctive relief and for damages. After a hearing on his request for a preliminary injunction, the trial court rendered judgment enjoining defendants from proceeding with the design and manufacture of the valves pending disposition on the merits.
In his reasons for judgment, the trial judge stated:
The Court is of the opinion that a confidential relationship was established between the parties when Mr. Crochet brought the whole package of secret information and concepts for the manufacture of the bellows sealed globe valve to the defendants. The Court rejects the defendants' argument that the information and ideas provided by Crochet do not constitute a trade secret because they are available in the public domain. The defendants admitted that they were unfamiliar with this type of valve prior to their meeting with Mr. Crochet in November, 1991. The Court finds that the defendants finessed Mr. Crochet to bring them all information he had regarding the Strack valve. In essence, they took his ideas and concepts and misappropriated them for their own benefit. The $70,000.00 spent on development largely went to the marketing and future development of the SMS valve. These expenses were incurred at the defendants' own risk.
The Court is of the opinion that the defendants should not profit from their position of confidence with plaintiffs. Allowing them to market and manufacture the SMS valve, or any similar valve, would provide them with an unfair competitive advantage which they would not otherwise have enjoyed.
Based on all testimony presented and evidence submitted, the Court finds that the plaintiffs have satisfied the requirements for the issuance of a preliminary injunction. Accordingly, the Court will grant the request for preliminary injunction.

ANALYSIS
On appeal, defendants contend that the trial court erred in finding that there was a trade secret under the Louisiana Uniform Trade Secrets Act ("LUTSA"). Defendants also argue that Crochet has failed to show that he will suffer irreparable harm absent a preliminary injunction.
LSA-R.S. 51:1431(4) defines trade secret as:
... information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
(a) derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and
(b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.
Whether or not something constitutes a trade secret is a question of fact. Engineered Mechanical Services, Inc. v. Langlois, 464 So.2d 329 (La.App. 1 Cir.1984), writ denied 467 So.2d 531 (La.1985). In this case, we are not convinced that the information at issue constituted a trade secret. The evidence adduced at the trial shows that the valves given by Crochet to defendant were unpatented and were available to defendants on the open market. The changes in design requested by Crochet were those necessary to make the valves conform to API and Chlorine Institute Specifications, which were also readily available to defendants.
However, the correctness of the decision of the trial judge does not rest alone upon a determination of whether defendants are in violation of LUTSA. LSA-C.C.P. art. 3601 allows injunctive relief "in cases where irreparable injury, loss or damage may otherwise result to the applicant." A plaintiff bears the following burden in obtaining a preliminary injunction:
To obtain a preliminary injunction the moving party must show that the damage *1392 he will suffer may be irreparable if the injunction does not issue, that he is entitled to the relief sought, and must make a prima facie showing that he will prevail on the merits of the case. General Motors Acceptance Corp. v. Daniels, 377 So.2d 346 (La.1979). Because an applicant for a preliminary injunction need make only a prima facie showing, less proof is required than in an ordinary proceeding for a permanent injunction. Hailey v. Panno, 472 So.2d 97 (La.App. 5 Cir.1985).
A preliminary injunction is an interlocutory procedural device designed to preserve the existing status pending a trial of the issues on the merits of the case. (Emphasis added.) Federal Nat. Mortg. Ass'n v. O'Donnell, 446 So.2d 395 (La.App. 5 Cir.1984). The trial judge has great discretion to grant or deny the relief. Id.

Irreparable injury means the moving party cannot be adequately compensated in money damages for his injury or suffers injuries which cannot be measured by pecuniary standards. Bagert v. Goldsmith, 504 So.2d 648 (La.App. 4 Cir.1987); McSwain v. Bryant, 503 So.2d 605 (La. App. 4 Cir.1987); Terrebonne Parish Police Jury v. Matherne, 405 So.2d 314 (La. 1981).
In his petition, Crochet alleges that defendants' actions constitute a breach of contract and a breach of fiduciary duty. Crochet may seek to enjoin defendants' actions if those actions constituting breaches cause him irreparable harm. See, for example, Huey T. Littleton Claims Service, Inc. v. McGuffee, 497 So.2d 790 (La.App. 3 Cir.1986).
In the case sub judice, Crochet testified that he expended considerable time and money, as well as years of experience, accumulating the information given to defendants. This time, money and experience represents a competitive edge that Crochet had, over any other entities who could compete with him in the valve market. Crochet also made a prima facie showing that he entered into a confidential relationship with defendants and that defendants received the information gathered by Crochet pursuant to that relationship. Accordingly, we find a prima facie showing of defendants' breach of fiduciary duty which deprived Crochet of his competitive edge. In IMI-TECH Corp. v. Gagliani, 691 F.Supp. 214 (S.D.Cal.1986), the court recognized that harm to a competitive position has no adequate remedy at law and, therefore, constitutes irreparable harm for which injunctive relief may be had. We agree with this determination and conclude that Crochet is entitled to an injunction preserving the existing status pending trial on the merits of this case.
Accordingly, we find that Crochet has made a sufficient showing of irreparable harm and that the trial judge did not err in granting the preliminary injunction.
For the reasons discussed above, the judgment of the trial court granting the preliminary injunction is affirmed. All costs of this appeal are assessed against defendants.
AFFIRMED.
GRISBAUM, J., dissents with written reasons.
GRISBAUM, Judge, dissenting with written reasons.
I respectfully dissent from the opinion of the majority. The record reflects plaintiff's pleadings seek relief under the Louisiana Uniform Trade Secrets Act (LUTSA). See La.R.S. 51:1431 et seq. Accordingly, our jurisprudence has mandated that the proper analysis is to first determine whether there is a legally protected trade secret. See Engineered Mechanical Serv., Inc. v. Langlois, 464 So.2d 329 (La.App. 1st Cir.1984), writ denied, 467 So.2d 531 (La.1985).
The LUTSA defines trade secrets in La. R.S. 51:1431(4) as:
"Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
(a) derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and

*1393 (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.
In accordance with the statutory scheme, the first-prong of our analysis will be to determine whether the information given by Crochet to Dicharry and Glore derived economic value from the fact it was not generally known and not readily ascertainable by proper means. Crochet's testimony reveals he disclosed to defendants "in confidence" something they had never seen before. However, the Bellows sealed globe valve makes up a class of valves (much like a crescent wrench is a class of wrenches). Bellows' technology has been around in the industry since the 1930s, and there is no patent on this particular valve.
It is above question the valve had no patent and could be legally copied by anyone with access to it. The defendants were given a valve by plaintiff and were able to decipher its construction mainly through reverse engineering, not the rudimentary drawings the plaintiff gave them. Reverse engineering is a proper means to ascertain an unpatented item. See Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989). Thus, I conclude the information given by Crochet to defendants is not a protected secret. Since the test of whether information is a trade secret fails the first prong of our statutory scheme, there is no need for further analysis.
However, the majority continues their analysis because they believe injunctive relief was justified due to plaintiff's so-called loss of a competitive edge and claims there is no adequate remedy at law for such a loss. In support of this, the majority cites IMI-TECH Corp. v. Gagliani, 691 F.Supp. 214 (S.D.Cal.1986).
I disagree with the majority's reliance on this case. I submit that the case is distinguishable from the case at bar. First, in IMI-TECH, there was definite existence of a trade secret. Here, even the majority concedes they are not convinced a trade secret existed.
Second, in IMI-TECH, there was a written, personal service agreement prohibiting employees from disclosing confidential information obtained while engaged in research and development. Here, there was no formal confidentiality agreement. Furthermore, the defendants were in possession of information that was not secret, but it is in the public domain, which makes misappropriation an impossibility.
Finally, I question the majority's recognition that there is no adequate remedy at law for damages brought about by loss of a competitive edge. I remind the Court of our own prior holding in Maestri v. Destrehan Veterinary Hosp., 554 So.2d 805 (La.App. 5th Cir. 1989) wherein we recognized damages to competitive business are subject to calculation. This would preclude the issuance of a preliminary injunction, since there is no irreparable harm.
But because I find no trade secret existed, I follow the statutory scheme under which the plaintiff has requested relief and end my analysis. I would hold the plaintiffs were not entitled the preliminary injunction.