687 So.2d 639 (1997)
DEFCON, INC., et al., Plaintiffs-Appellants,
v.
Kenneth WEBB, et al., Defendants-Appellees.
No. 28898-CA.
Court of Appeal of Louisiana, Second Circuit.
January 22, 1997.
*640 Cook, Yancey, King & Galloway by Kenneth Mascagni, Shreveport, for Plaintiffs-Appellants.
Wiener, Weiss, Madison & Howell by Katherine Clark Hennessey, Shreveport, for Defendants-Appellees.
Before NORRIS, BROWN and WILLIAMS, JJ.
BROWN, Judge.
Defcon, Inc. ("Defcon"), a Shreveport, Louisiana, manufacturing company, initially filed this lawsuit against Kenneth Webb, its former general manager and shop foreman, to enjoin the use and/or disclosure by Webb of what Defcon considered to be secret, proprietary information. Walker-Wheland, Inc. ("Walker-Wheland" or "W-W"), another Shreveport manufacturer, intervened seeking a declaratory judgment and was later added by Defcon as a defendant on grounds that it assisted or encouraged Webb in the breach of a fiduciary duty and had engaged in unfair trade practices. Defcon later alleged that Walker-Wheland had misappropriated trade secrets and had caused Defcon to go bankrupt. The trial court found for defendants, but rejected Walker-Wheland's claim for attorney fees. We affirm.

FACTS
Defcon was engaged in the manufacture of machined parts for the ammunition industry. In 1984, Defcon and three other machine shops, including Walker-Wheland, completed a qualification process that allowed them to submit bids on the M-825 Base Adapter Ring to Morton-Thiokol, a contractor for the United States Army.
Thereafter, bids were submitted for the production of the adapter ring. Defcon bid $12.00 per ring, while Walker-Wheland submitted a bid of $62.50 per ring. Defcon was the successful low bidder on four consecutive contracts to produce the ring. Defcon's advantage was due to a faster and cheaper manufacturing process devised by Kenneth Webb and other machinists in their shop. This process reduced the number of steps needed to produce the ring.
Because Walker-Wheland's bid on the first contract was deemed noncompetitive, they were not notified by Morton Thiokol when bids were solicited on new contracts. Moreover, Walker-Wheland expressed no interest in the adapter ring contracts until March 1986.
*641 On March 4, 1986, Defcon received notification for taking bids on a fifth contract. At this time, Defcon's management discussed increasing its bid price and Webb participated in these discussions.
On March 7, 1986, Webb resigned from Defcon. Thereafter, he contacted Morton-Thiokol about bidding to produce the adapter ring himself; however, he was told that he did not qualify under federal procurement regulations. He then approached another machine shop, Remco, about contracting his services to jointly produce the adapter ring. Remco had not been certified capable of producing the adapter ring and could not complete the qualification process in time to submit a bid. Webb then approached Ferrulmatic, a machining company that had previously qualified to produce the adapter ring; however, Ferrulmatic was not interested. Finally, Webb approached Walker-Wheland.
Within a week of leaving Defcon, on March 13, 1986, Webb spoke with Dale Haley, an employee with Walker-Wheland. On March 14, Webb met with executives at Walker-Wheland and returned to their shop on March 17 and 19. According to Webb, his intent was to form his own company to obtain contracts for machining services and then farm out or subcontract the actual work to firms like Walker-Wheland. Both Webb and Walker-Wheland's executives admitted that in the course of these meetings, Webb mentioned Morton-Thiokol's fifth request for bids on the adapter ring; however, Walker-Wheland executives claimed that they had already learned about the request from a steel vendor. The substance of these discussions between Webb and Walker-Wheland is disputed.
Plaintiffs argue that Webb divulged Defcon's production process, its bid range of $11.00-13.00 and its cost and profit data. Webb maintains that he simply informed Walker-Wheland that bids were being accepted for production of the ring, at which point Walker-Wheland chose of its own accord to reconsider and bid on the contract. Thereafter, Webb claims to have only visited Walker-Wheland's offices as a favor in an attempt to repair a broken machine.
On March 19, 1986, Webb personally delivered Walker-Wheland's bid on the ring contract to the Minden, Louisiana, offices of Morton-Thiokol. Webb testified that he had returned to Walker-Wheland to take a final look at a machine before going to Minden to look at commercial property and merely offered to deliver the bid on his way. Walker-Wheland submitted a bid of $10.89 per ring, while Defcon's bid was $12.50 per ring. The contract was awarded to Walker-Wheland.
Walker-Wheland went on to produce the ring using a manufacturing process nearly identical to that previously used by Defcon. In 1988, Defcon commenced Chapter 11 bankruptcy proceedings which were later converted to a Chapter 7 liquidation. Defcon's bankruptcy trustee, John Conine, was substituted as the proper party plaintiff in these proceedings.
One week after the bid was awarded to Walker-Wheland, Defcon filed to enjoin the use and/or disclosure by Webb of its machining process.[1] Walker-Wheland intervened and was later made a defendant in this action for breach of fiduciary duties, unfair trade practices and misappropriation of trade secrets.

TRIAL COURT'S OPINION
Following a 12 day bench trial, the court ruled in favor of defendants. Specifically, the trial judge noted that relief under the Louisiana Trade Secrets Act is restricted to one class of plaintiffsthe owners of "trade secrets." The trial judge concluded that Defcon's production processes were conducted on industry standard machines and equipment, employing universal machining principles and the skills of Defcon employees. In essence, the court found that Defcon had only refined techniques and procedures generally known throughout the machining industry and that such refinements did not rise to the level of a trade secret. Moreover, the *642 court found that because Webb was not employed under any confidentiality agreement or formal non-compete contract, he was free to take with him his skill, expertise and knowledge of Defcon's manufacturing procedures and could use his talents for his own benefit or for the benefit of Defcon's competitors. Finally, the court held that Defcon's suit was not filed for harassment purposes, and accordingly, rejected Walker-Wheland's request for an award of attorney fees. Defcon appeals. Walker-Wheland answers claiming error in the denial of attorney fees.

DISCUSSION
Defcon does not appeal the trial court's finding that its machining process was not a "trade secret" and thus, that they were not entitled to relief under the Louisiana Trade Secrets Act. Defcon argues, however, that the trial court did not address its primary claim that Webb breached, with the assistance of Walker-Wheland, a fiduciary duty owed to Defcon not to disclose to a competitor confidential information, even if not a trade secret. Defcon argues that the trial court committed errors of law by concluding that the existence of a "trade secret" and a written confidentiality agreement were prerequisites to a claim based on a breach of confidence or loyalty. In the alternative, Defcon asserts manifest error in the trial court's conclusions that Webb did not breach any fiduciary duties. Defcon also asserts error in the trial judge's decision to exclude from evidence certain admissions made during discovery.
Prior to the 1981 adoption of the Uniform Trade Secrets Act, La.R.S. 51:1431 et seq., the protection of confidential information was founded in a broad body of law concerning unfair competition and employer/employee relationships. Louisiana courts and federal courts sitting in diversity generally followed the same legal principles espoused in other jurisdictions and quoted liberally from legal encyclopedias and the works of commentators. While the genesis of these principles is old and diverse, they were succinctly set out in § 395 of the Restatement (Second) of Agency (1958):
Unless otherwise agreed, an agent is subject to a duty to the principal not to use or to communicate information confidentially given to him by the principal or acquired by him in the course of or on account of his agency or in violation of his duties as agent, in competition with or to the injury of the principal, on his own account or on behalf of another, although such information does not relate to the transaction in which he is then employed, unless the information is a matter of general knowledge.
The continuing nature of this obligation, even after the agency relationship terminated, was set forth in § 396 of the Restatement:
Unless otherwise agreed, after the termination of the agency, the agent: ...
(b) has a duty to the principal not to use or to disclose to third persons, on his own account or on account of others, in competition with the principal or to his injury, trade secrets, written lists of names, or other similar confidential matters given to him only for the principal's use or acquired by the agent in violation of duty. The agent is entitled to use general information concerning the method of business of the principal and the names of the customers retained in his memory, if not acquired in violation of his duty as agent; ...
These fiduciary duties provided relief to those whose competitive advantages were compromised through the misappropriation of confidential information. Standard Brands Inc., v. Zumpe, 264 F.Supp. 254 (E.D.La.1967); Engineered Mechanical Services, Inc. v. Langlois, 464 So.2d 329 (La. App. 1st Cir.1984); National Oil Service of Louisiana, Inc. v. Brown, 381 So.2d 1269 (La.App. 4th Cir.1980).
The Uniform Trade Secrets Act replaced the common law patchwork of jurisprudentially crafted remedies with an exclusive, statutory remedy for the misappropriation of competitively significant secret information meeting the definition of a "trade secret." The Act expressly "displaces conflicting tort, restitutionary, and other laws of this state pertaining to civil liability for misappropriation of a trade secret." La.R.S. 51:1437. The comments *643 following La.R.S. 51:1437, however, make it clear that the Act is not a comprehensive remedy, noting that it does not apply to duties imposed by law that are not dependant upon the existence of a trade secret, like an agent's duty of loyalty to his principal. A breach of fiduciary duty claim based upon the misappropriation of confidential information, although not technically a trade secret, is still recognized as grounds for injunctive relief and may serve as a basis for relief under Louisiana's Unfair Trade Practices Act. La.R.S. 51:1405(A); Corrosion Specialties and Supply, Inc. v. Dicharry, 93-196 (La.App. 5th Cir. 2/9/94), 631 So.2d 1389; Core v. Martin, 543 So.2d 619 (La.App. 2d Cir. 1989).
The elements of a fiduciary duty claim premised on a breach of confidence were set forth in Engineered Mechanical Services, Inc., supra as follows:
(1) possession by the plaintiff of knowledge or information which is not generally known,
(2) communication of this knowledge or information by the plaintiff to the defendant under an express or implied agreement limiting its use or disclosure by the defendant, and
(3) use or disclosure by the defendant of the knowledge or information so obtained in violation of the confidence, to the injury of the plaintiff.

Engineered Mechanical Services, Inc., 464 So.2d at 334.
Defcon alleged that it was in possession of two critical pieces of information relevant to the competitive manufacturing of the ring: a sequence or process for the efficient production of the ring and the company's projected bid range.
While the production sequence may have been comprised of commonplace procedures and techniques so as not to qualify technically as a trade secret, its laborious development suggests that Defcon's peculiar process was not generally known. Kenneth Webb testified that the process, though based on fundamental machining principles, was arrived at through painstaking refinement and effort. The trial transcript is replete with details concerning the exhaustive trial and error development of the process in Defcon's shop. Webb opined that the procedure was considered valuable and was in essence an asset that was not to be shared with competitors. Webb recognized that the procedure's value was enhanced because others did not know about it. The procedure was obviously a source of economic benefit. Its development over time through the continual efforts of competent, skilled machinists suggests that the process, while ascertainable, was probably not common knowledge in the machining industry.
Furthermore, the confidential nature of a bid range is readily apparent and it is intuitive that this information would not be generally known by competitors.
Webb's role in Defcon's operation necessarily made him privy to information regarding the ring production process. Indeed, Webb was instrumental in development of the procedure. His testimony reveals that he was aware that information regarding the procedure was not for dissemination. Webb indicated repeatedly that the ring production information was not given out, stating at one point that, "you know not to go out and tell what you are doing to other people" and later testifying that, "you didn't expose any of your information and your competitive edges." Carey Pearson, Defcon's majority shareholder and president, stated that information concerning ring production was given only to those employees who needed to know. Pearson noted that, "[i]t was apparent that it was our secret (the procedure), it was the thing we were doing."
Pearson also testified that immediately prior to Webb's departure, the two discussed raising the price of the ring compared to previous bids submitted by Defcon. Specifically, Pearson testified that he told Webb that Defcon's bid range was $11.00 to $13.00 for the March 1986 ring contract. Webb testified that he and Pearson discussed Defcon's bid. Webb indicated that he estimated costs and machining requirements from which Pearson determined a final bid figure. Webb could not recall whether the specific bid range was discussed, but stated that the *644 $11.00 and $13.00 parameters may have been mentioned. The evidence sufficiently proves that Webb was privy to confidential information concerning Defcon's intended bid range for the March 1986 contract. Implicit with this knowledge is the obligation to hold such information in confidence.
The machining process and Defcon's bid range were not generally known by Defcon's competitors and were confidential matters. Webb possessed this information under circumstances that made its confidentiality obvious. Thus, Defcon's breach of fiduciary duty claim rests on the factual question of whether Webb disclosed or misappropriated this information. The evidence offered in support of this final element stems primarily from the substance of meetings and conversations between Webb and Walker-Wheland executives from March 13 to March 19, 1986.
Kenneth Webb testified that he first attempted to contact John Lipinski, Walker-Wheland's shop supervisor, on March 13 to discuss his new machining subcontracting venture. Lipinski was absent and Webb spoke to another Walker-Wheland employee, Dale Haley. Webb asked Haley if W-W was going to bid on the fifth ring contract. Haley, however, was not aware of W-W's plans and there was no further discussion about the ring. Webb testified that he again tried to contact Lipinski on March 14. Instead, he reached Walker-Wheland president Karolyn Walker and arranged to meet with her and Lipinski that evening.
Webb stated that the March 14 meeting only lasted 30 to 45 minutes. The discussion centered around Webb's new venture and his desire to employ Walker-Wheland as a subcontractor. Webb sought to obtain bids from W-W on several jobs for which he already had blueprints. The adapter ring bid request was discussed briefly; however, Webb was adamant that Defcon's ring production sequence and bid range were not discussed. Webb mentioned only that the ring was difficult to manufacture due to the precise gauging tolerances involved. The meeting concluded with Webb and Lipinski entering W-W's shop area to inspect a malfunctioning machine.
Webb testified that he next visited Walker-Wheland on March 17 when he returned to the shop to attempt repairs on the machine he and Lipinski had inspected on March 14. Webb made his last stop at W-W on March 19. He stated that he had inspected commercial property across the street from W-W's facilities as a possible location to house his new business. He then stopped in to inform Lipinski that the broken machinery could not be repaired. This visit occurred around noon when W-W was hurriedly finishing its bid package for delivery to Morton-Thiokol before a 1:00 p.m. deadline. Webb testified that he did not assist W-W in the formulation of its final bid. Webb later left W-W's offices to inspect commercial properties in Minden, Louisiana. Because Morton-Thiokol's offices were on the way, Webb volunteered to hand deliver W-W's bid.
In response to questioning from the court, Webb again stressed that he never divulged Defcon's methods, tools, or procedures for manufacturing the ring. Indeed, Webb told the court that during his meeting with Lipinski and Walker, he learned that W-W was already aware of the upcoming ring contract, had developed an interest in bidding and indicated that it neither needed nor desired Webb's assistance on the project.
Karolyn Walker testified that Walker-Wheland had been made aware of the fifth ring contract immediately prior to being contacted by Webb. She recalled that during the March 14 meeting with Webb, he was asked only if the ring was a "good part." The substance of the meeting was devoted to learning of Webb's experience and degree of expertise in consideration of his new business and his proposed relationship with W-W.
John Lipinski testified that Walker-Wheland had first learned about the last ring contract on March 13. He recalled discussing Webb's new consulting business during the March 14 meeting. He also recalled asking Webb if the ring was a "good job." Lipinski was responsible for preparing W-W's bid on the ring contract. He described how the bid of $10.89 per ring was determined *645 and testified that Webb was not apprised of W-W's figures.
Webb's appearances at Walker-Wheland were also witnessed by assistant shop superintendent Kenneth McClung. McClung indicated that he passed in and out of meetings held between Webb and W-W executives and participated in some discussions in a limited capacity. McClung testified that he sat in on the March 14 meeting at Ms. Walker's request. He recalled the discussion of Webb's new business and a proposal that W-W perform some of Webb's machining requirements. McClung recalled Webb indicating that he could serve as a consultant on the upcoming ring contract, but noted that W-W was not interested because it had successfully produced the ring before. McClung stated that no bid information was discussed during the meeting and that he never heard Karolyn Walker ask Webb about Defcon's bid range.
In deposition testimony elicited in April 1986, McClung testified that he participated in a bid meeting on March 19 with Lipinski and Webb. McClung stated that the bid package was not shown to Webb, but that Lipinski might have shown Webb the final bid work papers. McClung's deposition testimony as a whole, however, is laced with uncertainty as to what precisely was discussed between Webb and W-W executives. At trial, McClung stated that he was mistaken about there having been a bid meeting attended by Webb and testified emphatically that Webb was not privy to W-W's bid discussions nor did he discuss Defcon's bid plans during the meetings at W-W.
Plaintiff presented no direct evidence that Kenneth Webb divulged to Walker-Wheland any confidential information regarding Defcon's production procedures or its bidding plans for the fifth ring contract. The parties present at these meetings universally denied that any such discussions occurred.
We can not avoid taking cognizance of the glaring and uncanny coincidences surrounding the timing of Webb's departure, his meetings with Walker-Wheland, the renewal of Walker-Wheland's interest in the ring project, its ultimately successful bid and the adoption of a production process nearly identical to that used by Defcon.
Defcon argues that Walker-Wheland's 1984 noncompetitive bid of $62.50 indicates that they experienced substantial difficulties and were incapable of competitively producing the ring. Kenneth McClung testified that in 1984, W-W had so much work that its equipment was already running overtime when it produced the 50 sample rings. Thus, a substantial capital investment in equipment and personnel would have been necessary to have been competitive and fulfill existing work orders. The noncompetitive $62.50 bid reflected these circumstances. McClung also explained that W-W experienced no difficulty machining the original fifty sample rings. Rather, the anomalies W-W experienced stemmed exclusively from the heat treating process which was performed by another contractor.
Defcon also asserts that Walker-Wheland's renewed interest in the ring was kindled when Webb defected and told W-W about the fifth contract. Gale Simmons, W-W's purchasing agent, testified that she was informed by a steel vendor on March 13, 1986, of inquiries concerning a particular type, size and quantity of steel and that "something was in the air." The steel requirements were familiar to Simmons because of W-W's previous bid on the ring in 1984. A review of blueprints retained by W-W confirmed that the steel of interest was identical to that used to produce the ring. James Davis, a senior buyer at Morton-Thiokol, testified that Gale Simmons contacted him on March 13, 1986, to inquire about a bid package for the fifth contract. W-W thus was aware of the ring contract before Webb's initial meeting with Lipinski and Walker on March 14.
Defcon also suggests that Walker-Wheland's bid of $10.89 on the fifth ring contract undercuts Defcon's low-bid parameter of $11.00 because Webb must have revealed Defcon's bid range. John Lipinski was questioned at length concerning the formulation of W-W's bid. Lipinski testified that his initial figure for the 1986 contract was $13.65 per ring. Knowing that successful bids had been as low as $12.00, Lipinski set about the *646 task of reducing W-W's bid figure to the eleven-dollar range. Numerous groups of cost figures were considered before reaching a bid price of $11.92. Lipinski testified that an arbitrary cut of ten percent was made to arrive at $10.73. Finally, it was decided to bid $10.89 on the gamble that other bidders seeking to stay below $11.00 would only reduce their price to $10.90.
Finally, Defcon argues that Walker-Wheland's use of a production process nearly identical to that used by Defcon proves that Webb must have explained the procedure. The record in this case is filled with the meticulous details of Defcon's production process. Also explained is the process W-W used to produce the 50 qualifying rings submitted in 1984. Defcon's procedure completed the machining of the multi-faced ring in approximately three minutes. Conversely, the process originally employed by W-W in 1984 took approximately 26 minutes per ring. In its 1986 production run, however, W-W had reduced its machining time to just under three minutes per ring. While the improvement was remarkable, W-W offered an explanation for its apparent machining metamorphosis.
Testimony from Webb and another machinist suggested that Defcon had neither developed nor employed any unique methods for manufacturing rings. Calvin Macy, a former Defcon machinist, testified that everything done by Defcon was "pretty much common sense stuff." Webb stressed repeatedly in his testimony that Defcon had developed nothing new in the refinement of its process. Instead, it was merely the application of fundamental machining principles.
Walker-Wheland employees testified to its experience in manufacturing and an ability to swiftly master the unique challenges of producing this adapter ring. W-W indicated that its original, uneconomical manufacturing process was necessitated by heavy work demands and the lack of time and machines to work on the project. W-W claimed that while the precise sequence employed by Defcon was not a matter of general knowledge, its honest discovery and swift adoption by an experienced shop is entirely plausible.
The opinion of the trial court discussed the testimony and after noting the circumstantial evidence, found:
... the evidence in this case was insufficient to exclude many other reasonable explanations of the conduct of Webb and Walker-Wheland, and woefully inadequate to exclude the credibility of Webb and the representatives of Walker-Wheland.
The trial judge assessed the credibility of those offering direct evidence. The judge found the trial testimony of Webb, Walker, Lipinski, and McClung to be credible when they denied the alleged illicit exchange of information while providing plausible explanations for events and circumstances that otherwise appeared suspicious.
The "ultimate" fact or conclusion of law flows from the "historical" facts and their inferences. Although appellate courts review both law and facts, we must accept the "historical" facts found by the trial court with great deference. This requires the appellate court to review the entire record to determine if there exist a reasonable basis for the trial court's factual conclusions. An appellate court may not substitute its own reasonable conclusions for those reached by the trial court which are also reasonable. We must accept the credibility determinations of the trial court and their inferences unless manifestly erroneous, which in its simplest terms means clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
In the instant case, we cannot say that the trial court was clearly wrong in believing the testimony of defendants and their witnesses.
Neither the responses to interrogatories nor the deposition of Karolyn Walker, which Defcon asserts were excluded from evidence in error, would have sufficiently bolstered Defcon's case. Thus, we find no error requiring reversal in the exclusion of this evidence.
Neither do we find erroneous the trial court's conclusion which barred Walker-Wheland's claim for attorney fees. Considering the strength of the inferences arising out of the circumstances of this case, Defcon's suit was not frivolous and the denial of fees was appropriate.

*647 CONCLUSION
Under the applicable standards of review, we find no error in the trial judge's conclusion rejecting Defcon's breach of fiduciary duty claim, and consequently, its unfair trade practices claim. We likewise concur in the trial court's denial of Walker-Wheland's request for attorney fees. The judgment below is affirmed and costs are assessed to plaintiff.
AFFIRMED.
NOTES
[1] When Morton-Thiokol discontinued use of the adapter ring, the request for injunctive relief became moot.