56 CCPA

**MINE SAFETY APPLIANCES COM-PANY, Appellant,**

v.

**The ELECTRIC STORAGE BATTERY CO., Appellee.**

**Patent Appeal No. 8055.**

United States Court of Customs and Patent Appeals.

Jan. 16, 1969.

Nims, Halliday, Whitman, Howes & Collision, New York City (Oliver P. Howes, Jr., Thomas A. Kain, New York City, of counsel), for appellant.

William J. Ruano, Pittsburgh, Pa., for appellee.

Before WORLEY, Chief Judge, and RICH, ALMOND, BALDWIN and KIRK-PATRICK,* Judges.

RICH, Judge.

This appeal is from the decision of the Patent Office Trademark Trial and Appeal Board, 150 USPQ 562 (1966),[1] sustaining an opposition by appelleee to the registration of an alleged trademark on the Principal Register on appellant's application serial No. 87,507, filed December 17, 1959.

The application describes the goods as "protective or safety helmets, hats, and caps * * *." They are the type of "hard hat" worn by miners, construction workers, well drillers, and the like to protect the wearer's head from falling objects, bumps, and blows.

---

* Senior District Judge, Eastern District of Pennsylvania, sitting by designation.

1. There were two prior decisions of the board on a motion and renewed motion for summary judgment, both denied, 140 USPQ 671 (Dec. 20, 1963) and 143

USPQ 163 (Oct. 21, 1964). The latter was commented on in Derenberg's Eighteenth Year of the Lanham Act, 146 USPQ No. 6, p. 4 and the decision here on appeal in his Nineteenth Year, 150 USPQ No. 10, p. 3.

What is sought to be registered as a trademark is the configuration of the crown portion of the hat, which is dome-shaped, the alleged distinctive feature consisting of ribs or corrugations extending outwardly of the crown and arranged in a particular manner. There are two main ribs, extending from front to back and from side to side and intersecting at right angles, which divide the crown of the hat into four quadrants. In each quadrant there are two ribs forming an inverted "V" which points to but does not touch the intersection of the two main ribs. Thus there are, in effect, twelve ribs or upstanding corrugations extending from the central portion of the crown toward the brim and terminating short thereof. This configuration is illustrated in the board's opinion and need not be repeated here.

Registration is sought under section 2(f) of the Trademark Act, 15 U.S.C. § 1052(f), and a supporting affidavit was filed alleging "substantially exclusive and continuous use in interstate commerce for at least five (5) years next preceding the filing of this application." Use since October 1939 is claimed.

The configuration here alleged to function as a trademark and sought to be registered was the subject of Design Patent No. 118,432 to H. B. Lewis, issued Jan. 2, 1940, and expired Jan. 2, 1954, the claim, however actually covering the appearance of the entire hat including the rim portion.[2] Lewis also obtained a utility patent, No. 2,248,366, July 8, 1941, which expired in 1958 in which the drawings illustrate the identical ribbed crown design on a pressed sheet-metal hat and wherein the specification states, "The crown 21 of the hat may be embossed to provide reinforcing ribs 25."

Appellant's predecessor in business with respect to the hats here involved appears to have been the B. F. McDonald Company of Los Angeles which sold the Lewis hats, of the same design here sought to be registered. The McDonald Company later became a subsidiary of appellant. The hats have been sold as "McDonald Safe-T-Hats" and cap versions as "McDonald Safe-T-Caps."

The record shows, as the board pointed out, that

Applicant's advertising and promotional material, like that of its predecessor, over the years, has been replete with references to the ribbing and corrugated design, but only for its function in strengthening the crown or in deflecting falling objects as, for example,

2. We do not find it necessary herein to discuss again the legal effect of the existence and expiration of design patent protection. For our views on that matter, see In re Mogen David Wine Corp., 328 F.2d 925, 51 CCPA 1260 (1964) and 54 CCPA 1086, 372 F.2d 539 (1967).

Although appellee's arguments here, as below, are based in part on the Supreme Court decisions in Sears, Roebuck and Co. v. Stiffel Co., 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661, and Compco Corp. v. Day-Brite Lighting, Inc., 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669, and dicta in the opinions therein, we find it unnecessary, as did the board, to consider their applicability. Cf. Judge Smith's concurring opinion in the second Mogen David case, supra. We do not, however, agree with the position taken in appellee's brief. He says, for one thing, that the Constitution "grants" patent rights only for limited times. The Constitution grants no patent rights, it grants only authority to Congress to enact laws. He also argues, as is all too prevalent, that the *patent laws* put things *into* the public domain when patents expire. Patent laws function only to keep things *out* of the public domain temporarily. They have nothing to do with putting things into it. They say nothing about right to copy *or* right to use, they speak only in terms of right to *exclude*. "Public domain," moreover, is a question-begging legal concept. Whether or not things are in or out of the public domain and free or not free to be copied may depend on all sorts of legal concepts including patent law, antimonopoly policy and statutes, the law of unfair competition, copyright law, and the law of trademarks and trademark registration. What we really do is to determine these *legal* rights; then we may express the ultimate conclusion by saying something is in the "public domain"— or not in it. All we are concerned with here is the statutes pertaining to trademark registration and the case law construing those statutes.

"Vertically ribbed for extra strength without impairing ability to deflect falling objects", "strong duraluminum shells corrugated for maximum resistance to blows from falling and flying objects", and "In the Type 'T' Model the crown is corrugated for maximum resistance to blows from falling and flying objects * * * ".

In conjunction with this fact, there is an important admission by appellant, filed in response to a request for admissions, that "applicant has never stated in its advertising or in the advertising of its former subsidiary that the rib or corrugation design was a trademark.

The board further pointed out that

Applicant first began to experience competition in the sale of aluminum safety hats and caps in the early 1950's (the design patent expired in 1954). Currently, there are numerous manufacturers and/or sellers of aluminum protective hats and caps with corrugations running radially outwardly from the top center. While slight differences exist in the corrugation arrangements, none of these competitors have advertised such arrangements as constituting their trademarks and, like applicant and its predecessor, they have alluded, in their advertising and promotional literature, only to the functional features of the designs in stiffening or reinforcing the crown and deflecting falling objects. One of appellant's competitors, The Fibre-Metal Products Company, advertised aluminum caps and hats with a crown design substantially similar to that of applicant in the trade publication, "National Safety News", in January 1959, a time prior to the filing of the subject application.

Appellant does not deny this.

An episode of considerable significance, in our view, is the following, as reported by the board:

Beginning in January 1960, after the subject application was filed, and continuing through July 1961, applicant sold about fifteen thousand aluminum protective hats and caps bearing the identical corrugation or design in issue to the Welsh Manufacturing Company of Providence, Rhode Island, a company unrelated to and under no control of applicant. Applicant permitted this company to advertise and sell these hats under its own name and trademark. These hats had no indication that they were of applicant's origin. This sale was made assertedly on the ground that Welsh was not in competition with applicant because Welsh distributed its hats through wholesale outlets to small users as distinguished from those large users contacted by applicant's sales personnel. According to Welsh's vice-president in charge of sales, Welsh has been for many years engaged in the sale of industrial safety supplies; and the hats and caps purchased from applicant were sold under the mark "Vanguard", and stickers bearing this mark were placed inside the hats; that these hats were promoted and advertised under this mark in nationally distributed trade publications and through the distribution of catalog pages and like material to safety supply distributors and distributors throughout the United States for redistribution to their customers; and that in view of the national distribution by Welsh of these hats through distributors located in all of the United States, Welsh's sales representatives were "running into applicant's sales people" at the customer-consumer level and were, in fact, competing for the sale of identical safety hats to substantially the same customers.

Appellant's brief has no answer to this situation, which clearly would make it impossible for anyone to know, merely from looking at a hat, whether it originated with appellant or with Welsh Manufacturing Company, except to say that 15,000 hats were *"de minimis"* in view of its sales of 100,000 hats a year in each year from 1950 through 1960. Under

all the circumstances here we cannot regard this as de minimis.

 Furthermore, it appears that opposer-appellee has been selling hats with a substantially identical crown design at least since 1959, believing it had the right to do so. In answer to a question at oral argument, appellant's counsel indicated that nothing has been done to stop opposer's sales for the reason that counsel felt the attempt would not succeed, at least in the absence of such a federal registration as appellant is here seeking to obtain. This would seem to be very close to an admission that appellant does not have trademark rights in the rib design. It is our understanding of the Lanham Act that it is for the *registration,* not the *creation,* of trademarks. Its terminology—indeed, the history of federal trademark statutes—presupposes the pre-existence of a trademark to be registered.

In any event, we are satisfied that the board was correct in its conclusion, in view of the structural functionality of the rib design, its advertisement as a structurally advantageous feature, the sale by others of safety hats with similar if not identical rib designs, also promoted as functionally advantageous, and appellant's permissiveness in letting the Welsh Manufacturing Company sell hats with the identical design as its own hats, that the rib design is not in fact a trademark, notwithstanding the testimony of numerous witnesses that because of it they are able to recognize safety hats as being of appellant's manufacture. They testify to that effect as a matter of personal belief; but that carries no assurance that they really can tell who made the hat or who stands behind it merely from the appearance of the ribs.

The board also concluded on the record that the rib design had not "become distinctive of applicant's goods in commerce." This is but another way of saying it is not a trademark. Registration was therefore properly refused and the decision of the board is affirmed.

*Taxation of Costs*

A few papers were added to the printed record on request of appellee, above and beyond others to the inclusion of which appellant consented. The cost of printing them is hereby taxed against appellee.

Affirmed.