677 So.2d 1086 (1996)
PONTCHARTRAIN MEDICAL LABS, INC.
v.
ROCHE BIOMEDICAL LABORATORIES, INC., Ellen Landry, and Carol Hall.
No. 95 CA 2260.
Court of Appeal of Louisiana, First Circuit.
June 28, 1996.
*1087 Matthew K. Brown, New Orleans, for Plaintiff-Appellant.
James A. Babst, New Orleans, for Defendant-Appellee.
Before PARRO, KUHN, JJ., and IAN W. CLAIBORNE, J. Pro Tem.[1]
AN W. CLAIBORNE, Judge, Pro Tem.
Pontchartrain Medical Labs, Inc. (plaintiff), sued Roche Biomedical Laboratories, Inc. (defendant), alleging it misappropriated trade secrets belonging to plaintiff, breached its contract with plaintiff, and violated Louisiana laws prohibiting unfair trade practices.[2] After a three-day jury trial, a verdict was rendered in favor of defendant, and the trial court entered judgment accordingly. Plaintiff appeals.
The jury found defendant did not breach its contract with plaintiff and did not engage in unfair trade practices. Plaintiff does not contest these findings. Plaintiff's appeal is based on the jury's findings on the trade secrets issue, which it contends are inconsistent.

FACTUAL BACKGROUND
In 1981 R. Scott Foster, a microbiologist and immunologist, initiated the formation of Pontchartrain Medical Labs, Inc., a local service laboratory (stat lab), to provide medical testing for doctors, clinics, hospitals, veterinarians, *1088 and anyone else who needed rapid test results in the three-parish area north of Lake Pontchartrain. (St. Tammany, Tangipahoa, and Washington Parishes comprise this area, known locally and referred to hereinafter as "the Northshore".) Local physicians provided financial backing and were investors/owners. A stat lab performs only simple standardized tests. More complex tests are done at a reference lab. Foster selected defendant as plaintiff's reference lab.
Plaintiff's client base and revenue steadily increased. At first, Foster did everything himself, from soliciting business to running tests to typing bills. In 1983 plaintiff began questioning whether it should continue to use defendant as its reference lab. To foster their business relationship, defendant proposed a closer alliance with more support for the lab. On April 1, 1984, Foster became an employee of both plaintiff and defendant, receiving pay from both. Defendant hired Ellen Landry, a registered medical technologist, as lab supervisor.
In 1985 Foster was transferred to defendant's office in North Carolina. Foster, as plaintiff's president, performed certain administrative functions from his home in North Carolina, but he had no part in the day-to-day activities of the lab. On August 30, 1985, plaintiff contracted with defendant. The contract declared the parties were "independent entities contracting with each other" and neither should be "construed to be the agent, employer or representative of the other." Defendant agreed to establish and maintain the lab within plaintiff's facility, to provide reference lab testing, to comply with plaintiff's then-current fee schedule, to rent the facility and all equipment from plaintiff, to maintain the equipment at its expense, to hire and pay all employees, to provide all necessary supplies, to conduct all billing, and to pay plaintiff a 5% commission on all billings except those to Highland Park Hospital. The contract stated a copy of the fee schedule and of plaintiff's customer list were attached, although nothing is attached to the copy of the contract in the record.
Foster testified he gave defendant a list of the sixty to seventy customers plaintiff had at the time. The list contained each customer's special prices. He also wrote all of plaintiff's customers advising them of the change. Landry stated she was unaware of this customer list.
Defendant brought in sales representatives and in April 1986 computerized the lab. Carol V. Hall, one of defendant's sales representatives, took over the Northshore territory in early 1986. She stated she did not have access to a customer list. She made "cold calls," determining a doctor's specialty from the telephone book and getting the doctor's special pricing from his or her staff, if possible.
On December 11, 1986, plaintiff and defendant entered into a new contract which increased the commissions paid to plaintiff from 5% to 10%. Defendant again agreed to comply with the current fee schedule. The agreement stated the fee schedule was attached, although there are no attachments to the copy of the contract in the record. No mention is made in the 1986 contract of a customer list.
In 1988 defendant's president, Dr. Powell, became concerned about federal investigations into physician-owned labs. Powell decided to change or terminate any relationships defendant had which might lead to federal investigations. On June 30, 1988, defendant's assistant vice president, Daniel P. Apple, wrote plaintiff and advised it that defendant was exercising its rights under the contract to terminate the agreement upon ninety days written notice. Apple stated the termination would "be effective September 30, 1988 unless RBL and PML can prepare and implement a mutually acceptable alternative arrangement."
Apple analyzed data regarding plaintiff and worked with defendant's counsel to prepare an offer for defendant to buy plaintiff. Apple reached the conclusion the lab was worth $250,000.00. However, Powell decided to offer twice that sum. He told Apple he was willing to "take a hit" in order to get out of a physician-owned arrangement while continuing a good relationship with those doctors.
*1089 In July 1988 defendant offered $550,000.00, to be paid over five years, but the offer was rejected. Dr. Gerald Foret, an investor in plaintiff and its treasurer, testified the offer was rejected because the investors did not think it was enough. Foster stated the investors thought the annual payments under the buyout agreement were equal to the annual commissions. The investors believed if they accepted the offer, they would receive the same amount of money they had been receiving for five years, and then they "would have no assets to show and the lab would be out of [their] control."
Apple testified that about this time, more articles appeared in professional journals about the government "cracking down" on physician-owned labs, and Powell decided to terminate all physician-owned lab arrangements. On August 19, 1988, defendant notified plaintiff its offer was rescinded.
What defendant did not know when it sent the termination letter, offered to buy plaintiff, and then rescinded the offer was that plaintiff was already negotiating with Smith-Kline Bio-Science Laboratories, another large corporation, for it to manage the lab. Landry learned in August 1988 that plaintiff planned to contract with SmithKline when two of the physician-investors came to the lab and informed her of the change. She stated they also asked her if she could surreptitiously get pricing information for them from the computer. Landry testified she refused their request for three reasons: 1) the information stored in the computer was not in list form; 2) she had a confidentiality agreement with defendant; and 3) she felt uncomfortable getting the information secretly. She told them she was certain they could get the information from Apple or from anyone at defendant's Lab Concepts Division. She stated Foret came by later and asked about pricing information. She told him to ask Apple for the information.
Rather than contacting Apple, plaintiff's counsel wrote to defendant on September 19, 1988. The letter was addressed to "Roche Biomedical Laboratories ... Attention: Director, Contracts." The letter is marked as received by defendant on September 21, 1988, and was forwarded the following day to defendant's in-house counsel, Brad Smith. Smith apparently contacted Apple, who then asked Landry to get the information.
Landry and Hall explained that in order to obtain pricing information for a particular customer, it was necessary to look at two sources, an "8 screen," which gives special prices for each customer by test code and account number, and a separate list of test and panel codes. They both testified no single document provided all this information. Landry stated it took her several days to print the requested information from the computer on each of the approximately 200 customers, but she did so as quickly as possible and delivered the information to plaintiff. It is undisputed plaintiff received all the printouts by October 14, 1988.

THE JURY VERDICT
The jury was asked to answer three interrogatories on the trade secrets issue. The questions and responses were as follows:[3]
Number 1: Did the customer information allegedly taken by defendant and used in the operation of Roche Biomedical Laboratories after October 1, 1988, constitute trade secrets?
Answer: Yes.
Number 2: Did Roche Biomedical Laboratories have a confidential relationship with Pontchartrain Medical Labs such that it had a duty not to misappropriate the trade secrets of Pontchartrain Medical Labs?
Answer: Yes.
Number 3: If you find that Roche Biomedical Laboratories had a confidential relationship with Pontchartrain Medical Labs such that it had a duty not to misappropriate the trade secrets of Pontchartrain Medical Labs, did it in fact misappropriate trade secrets of Pontchartrain Medical Labs, either by using them in the operation of Roche Biomedical Laboratories *1090 or refusing to provide those trade secrets to Pontchartrain Medical Labs when requested?
Answer: No.

PLAINTIFF'S CONTENTIONS
Plaintiff contends in its sole assignment of error that the jury's verdict on the trade secrets issue is internally inconsistent. Plaintiff argues the third question does not call for a finding of fact by the jury and contends a legal conclusion that defendant misappropriated plaintiff's trade secrets must logically follow affirmative answers to questions one and two. We find no inconsistency.
At the outset, we note plaintiff failed to object to these interrogatories at any time during the trial, although the parties were given an opportunity to do so by the trial court in accordance with Louisiana Code of Civil Procedure article 1812(B). The trial court noted for the record both parties had reviewed the interrogatories and were satisfied. We also note when the verdict was read, plaintiff neither asked the trial court to return the jury for further consideration of its answers nor asked for a new trial. Plaintiff's argument that the jury verdict is inconsistent is raised for the first time on appeal.

ANALYSIS
The Louisiana Uniform Trade Secrets Act governs this case. La.R.S. 51:1431-39. The plaintiff has the burden of establishing both the existence of a legally protectable secret and a legal basis upon which to predicate relief. Engineered Mechanical Servs. v. Langlois, 464 So.2d 329, 333 (La.App. 1st Cir.1984), writ denied, 467 So.2d 531 (La.1985). A customer list or special pricing list may be a trade secret if efforts are made to maintain its secrecy. See Wyatt v. PO2, Inc., 26,675 (La.App.2d Cir. 3/11/95), 651 So.2d 359, writ denied, 95-0822 (La. 5/5/95), 654 So.2d 331.
Plaintiff contends since the jury found the information allegedly used by defendant after October 1, 1988, constituted trade secrets and defendant had a duty not to use or disclose plaintiff's trade secrets, it necessarily follows defendant's use of the customer list after that date was misappropriation. Defendant contends, however, plaintiff has misinterpreted the jury's findings.
The threshold inquiry in every trade secrets case is whether a legally protectable trade secret actually existed. Engineered Mechanical, 464 So.2d at 333. The second element is whether an express or implied contractual or confidential relationship existed between the parties which obligated the party receiving the secret information not to use or disclose it. Id. Finally, the plaintiff must prove the party receiving the secret information wrongfully breached its duty of trust or confidence by disclosing or using the information to the injury of plaintiff. Id. at 334; La.R.S. 51:1431(2)(b)(ii)(bb).
The trade secrets at issue in this case were the names of plaintiff's customers and the special prices offered those customers. Although plaintiff attempted to treat the 1985 and 1988 customer lists as one entity, the evidence established they were two very distinguishable items. Foster testified the 1985 list attached to the contract contained approximately 60 to 70 customers' names and the special prices offered those customers. The 1988 list contained the names and special prices of approximately 200 customers. It was a combination of plaintiff's 1985 customers, defendant's 1985 customers, and customers solicited by Hall, defendant's sales representative, from 1986 through 1988 for use by plaintiff and defendant. Hall testified special prices were guaranteed for one year, after which they were usually increased, although they could remain the same or decrease due to competitive pressure. She stated to the best of her knowledge none of the special prices were the same in 1988 as they were in 1985.
In this case, the 1985 list containing plaintiff's customer information unquestionably belonged solely to plaintiff. Ownership of the 1988 information, however, was disputed. The jury found the "customer information allegedly taken by defendant and used in the operation of Roche Biomedical Laboratories after October 1, 1988," constituted trade secrets. However, the jury was never asked to explicitly determine whether those secrets *1091 belonged solely to plaintiff, solely to defendant, or to plaintiff and defendant jointly.
The jury found defendant's relationship with plaintiff was such that it had a duty not to misappropriate plaintiff's trade secrets. The jury further found defendant did not misappropriate plaintiff's trade secrets, either by using them in the operation of defendant's lab or by refusing to provide them when requested. The conclusion implicit in these factual findings is that plaintiff was not the sole owner of the 1988 customer information.
Whether defendant misappropriated plaintiff's trade secrets is a question of fact. The jury's factual finding on this issue can be reversed only if it is manifestly erroneous or clearly wrong. Where there are two permissible views of the evidence, the jury's choice between them cannot be considered manifestly erroneous or clearly wrong. Stobart v. State, 617 So.2d 880, 883 (La.1993).
We have reviewed the record in its entirety and conclude the jury's finding defendant did not misappropriate plaintiff's trade secrets is a permissible view. Louisiana Revised Statute 51:1431(2)(b), upon which plaintiff relies, requires proof of "disclosure or use of a trade secret of another without express or implied consent...." (Emphasis added.) Defendant acquired the 1988 customer information primarily through the efforts of its own employees. There is no evidence in the record that when defendant acquired this information, it understood this information belonged solely to plaintiff. When properly requested to do so, it freely shared the information it had with plaintiff.
Furthermore, the jury obviously concluded neither the delay in providing the information to plaintiff nor providing the information in the form of computer printouts rather than one list was a refusal to provide the information, as contended by plaintiff. Instead of contacting Apple directly as suggested by Landry, plaintiff chose to have its counsel request the information in writing. The request was not received by Apple until shortly before the end of the contract term, and the information was provided to plaintiff within two weeks after termination of the contract, which was reasonable under the circumstances. The jury's finding defendant did not refuse to provide the information was a permissible view which was not manifestly erroneous.

CONCLUSION
For the foregoing reasons, the judgment of the trial court is affirmed. All costs of this appeal are taxed to plaintiff, Pontchartrain Medical Labs., Inc.
AFFIRMED.
NOTES
[1] Judge Ian W. Claiborne of the 18th Judicial District Court is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] Plaintiff also sued Ellen Landry and Carol V. Hall, but the trial court granted a directed verdict dismissing them at the close of plaintiff's case.
[3] Although the trial court directed the clerk to record the jury verdict sheet, it is not in the appellate record. The interrogatories and responses were read into the record by the clerk, however, and appear in the trial transcript.