REVISED

UNITED STATES COURT OF APPEALS
For the Fifth Circuit

No. 96-30173

IRVING REINGOLD,

Plaintiff-Appellant,

VERSUS

SWIFTSHIPS, INC.,

Defendant-Appellee.

Appeal from the United States District Court
for the Western District of Louisiana

October 16, 1997

Before KING, JOLLY, and DENNIS, Circuit Judges

DENNIS, Circuit Judge:


Appellant, Irving Reingold, appeals from the district court's partial summary judgment dismissing his actions against the appellee, Swiftships, Incorporated, under the Louisiana Uniform Trade Secrets Act and the Louisiana Unfair Trade Practices Act. We reverse and remand these actions to the district court.

I.

We review a district court's grant of summary judgment *de novo,* applying the same standard of review as would the district

court. *See, e.g., Melton v. Teachers Ins. & Annuity Ass'n of Am.,* 114 F.3d 557, 559 (5th Cir. 1997); *Dawkins v. Sears Roebuck and Co.,* 109 F.3d 241, 242 (5th Cir. 1997)(citing *Cockerhan v. Kerr-McGee Chem. Corp.,* 23 F.3d 101, 104 (5th Cir. 1995)). Summary judgment is proper only when it appears that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). On summary judgment the inferences to be drawn from the underlying facts contained in the affidavits, depositions, and exhibits of record must be viewed in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

## II.

Construing the record on summary judgment in the light most favorable to the nonmoving party, Reingold, we find or infer the following facts.

Appellant Irving Reingold purchased a 90 foot portable female fiberglass boat mold from Thompson Industries of Titusville, Florida ("Thompson") in 1983. Thompson had constructed the mold over a period of nine months at a cost of $1 million. The mold was cast from a plug, which is a hull turned upside down. To make such a mold multiple layers of fiberglass are laid on either side of a balsa wood core over a plug and the structure is braced externally with steel piping. The 90 foot mold built by Thompson was the largest structure of its kind in the United States at the time of

its construction.  Thompson used the mold to build two hulls for fiberglass boats which were sold to customers.

Swiftships, Incorporated ("Swiftships") first contacted Reingold about purchasing or leasing the mold in 1986.  At that time, Swiftships was attempting to secure a contract with the United States Navy to construct two fiberglass-hulled research survey vessels ("RSVs").  Swiftships had never built a fiberglass hull and owned no fiberglass mold of its own.  Swiftships negotiated the agreement to produce the RSVs between 1986 and 1990.  During that time, Swiftships continued conversations with Reingold over the terms of a lease or a purchase of the 90 foot mold.

In October of 1990, Swiftships entered the RSV contract with the United States Navy.  One week later, Swiftships signed a lease agreement with Reingold for use of the 90 foot mold.  The five-year lease provided that Swiftships would pay Reingold $100,000 upon signing and an additional $145,000 each for the first two vessel hulls constructed from the mold.  Swiftships also agreed to pay $20,000 for each additional hull made using the mold or $20,000 per year for any year in which a hull was not made from the mold.  The terms of the lease required Swiftships to give advance written notice each time the mold was used to construct a hull.  At the end of the lease, Swiftships was obligated to turn over any modifications of the mold and any plans for such modifications.

The mold was delivered to Swiftships in November of 1990.  During the course of the lease, Swiftships made two hulls from the

mold and paid Reingold in accordance with the lease. Swiftships also used the mold to make a third hull, which Swiftships contends was merely a thin "test liner." Swiftships did not give Reingold notice or compensation for the third or "test" hull. In the meantime, Swiftships secured a second contract with the Government of Egypt to produce three 110 foot coastal minehunting vessels ("CMVs"). Swiftships hired Accurate Fiberglass, Incorporated ("Accurate") to construct a 110 foot mold to be used in building the hulls for the CMVs. Swiftships instructed Accurate to use a portion of the third or "test" hull made from Reingold's 90 foot mold in constructing the 110 foot mold. Accurate incorporated the first 45 feet of the 90 foot "test" hull into the front portion of the 110 foot mold. Reingold contends that Swiftships used his 90 foot mold, without notifying or compensating him, to make the front 40 to 45 feet of a new 110 foot mold for the Egyptian ships and thereby misappropriated his trade secrets and committed unfair trade practices. Swiftships argues, however, that it used the bow portion of the "test" hull only as construction material that it reshaped and reformed according to independently derived design plans to make the new 110 foot mold. In May of 1994 Swiftships terminated the lease and returned the 90 foot mold to Reingold. Swiftships has refused, however, to turn over to Reingold the 90 foot "test" hull or to compensate him for its use.

III.

-4-

Reingold filed suit in December of 1994 alleging that Swiftships's actions in making and using the third hull constituted: (1) a breach of contract; (2) conversion; (3) fraud; (4) negligent misrepresentation; (5) a violation of the Louisiana Unfair Trade Practices and Consumer Protection Act ("LUTPA"); and (6) a violation of the Louisiana Uniform Trade Secrets Act ("LUTSA"). On April 20, 1995, Swiftships moved for summary judgment on the breach of contract claim, the deceptive trade practices claim, and the trade secrets claim. The district court denied the motion as premature because sufficient discovery had not been conducted to properly rule on the motion. The court set a trial date of August 28, 1995. At the pre-trial conference, Swiftships moved for a continuance as it was attempting to procure documents from the Copyright Office at the Library of Congress which, it averred, were relevant to its defense on the trade secrets claim, but had not yet been obtained. That motion was granted.

Swiftships filed a Supplemental Motion for Summary Judgment on September 7, 1995. The supplemental motion sought dismissal on the same grounds as the original summary judgment motion. The district court granted partial summary judgment and dismissed Reingold's claims under the LUTPA and the LUTSA.[1] The district court provided

---

[1] The district court denied summary judgment as to Reingold's claims for breach of contract. Trial has been scheduled for October 20, 1997.

no statement of reasons in its order. The district court then directed entry of final judgment in favor of Swiftships on the LUTPA and the LUTSA claims pursuant to Federal Rule of Civil Procedure 54(b). Reingold filed this appeal challenging the grant of partial summary judgment. In this diversity jurisdiction lawsuit, we look to the law of Louisiana to determine the substantive rights of the parties under both of appellant's claims.

IV.

A.

Under the Louisiana Uniform Trade Secrets Act (LUTSA), LA. R.S. 51:1431-39, a complainant may recover damages for the actual loss caused by the misappropriation of a trade secret. *Id.* § 1433. In order to recover damages, a complainant must prove (a) the existence of a trade secret, *Pontchartrain Med. Labs. Inc. v. Roche Biomedical Labs. Inc.*, 667 So. 2d 1086, 1090 (La. Ct. App. 1st Cir. 1996); *Engineered Mechanical Serv., Inc. v. Langlois*, 464 So. 2d 329, 333 (La. Ct. App. 1st Cir. 1984), (b) a misappropriation of the trade secret by another, and (c) the actual loss caused by the misappropriation. LA. R.S. 51:1431, 1433. The LUTSA adopts the Uniform Trade Secrets Act (UTSA) definitions of "trade secret" and "misappropriation," in pertinent parts, as follows:

Trade secret

"Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(a) derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and

(b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. *Id.* § 1431(4)(a),(b).

Misappropriation

"Misappropriation" means . . . use of a trade secret of another without express or implied consent by a person who:

(i) used improper means to acquire knowledge of the trade secret; or

(ii) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:

. . .

(bb) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use[.] *Id.* § 1431 (2)(b).

A complete catalogue of the means which are "improper" for a person to acquire knowledge of the trade secret is not possible, but Section 1431(1) includes a partial listing: "theft, bribery, misrepresentation, breach, or inducement of breach of a duty to maintain secrecy, or espionage through electronic or other means." *Id.; see also United Group of Nat'l Paper Distr., Inc. v. Vinson*, 666 So. 2d 1338, 1345 (La. Ct. App. 2d Cir. 1996); *Pontchartrain Med. Labs,* 677 So. 2d at 1091; *Sheets v. Yamaha Motors Corp.*, 849

F.2d 179, 183 (5th Cir. 1988); *Vault Corp. v. Quaid Software Ltd.*, 655 F. Supp. 750, 763 (E.D. La. 1987), *aff'd on other grounds*, 847 F.2d 255 (5th Cir. 1988).

As the moving party, appellee Swiftships has the initial burden of demonstrating that the Rule 56(c) test--"no genuine issue as to any material fact"--is satisfied and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Higginbotham v. State Farm Mutual Auto. Ins. Co.*, 103 F.3d 456, 458 (5th Cir. 1997); 10A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2727 (2d ed. 1983 & Supp. 1997). In support of its motion for summary judgment Swiftships sought to show that it had not misappropriated Reingold's 90 foot ship mold. Specifically, Swiftships attempted to demonstrate that, contrary to Reingold's allegations, it had not improperly used part of Reingold's 90 foot mold to develop a new 110 foot mold but that it had independently designed and built its 110 foot ship mold.

In support of its motion, Swiftships filed the affidavit of its executive vice president, Calvin Le Leux. Le Leux stated that his company used Reingold's 90 foot ship mold only twice to build two RSVs for the United States Navy and paid Reingold each time pursuant to the lease. However, in connection with building the RSVs, Le Leux said, a thin "test liner" had been laid inside the 90 foot mold to show the Navy that Swiftships had the capability of properly laying and removing an intact fiberglass hull. Afterwards, the "test liner" was partly used as scrap material and

partly discarded, he said. Under a different contract with the Government of Egypt, Swiftships needed a 110 foot ship mold to construct three 110 foot coastal minehunter vessel (CMV) hulls. Le Leux stated that a new 110 foot mold was designed based on a Swedish Navy hull having a different size, shape, and characteristics than Reingold's 90 foot mold. Le Leux conceded that Swiftships instructed Accurate Fiberglass, Incorporated, its subcontractor, "to use approximately 40 feet of the bow portion of the scrap 90 ft. liner as structural material to save time in the construction process of the new 110 ft. mold." He added, however, that "in order to be used as structural material for the new 110 ft. mold, the form and shape of approximately 40 ft. of the forward portion of the 90 ft. scrap liner had to be altered and changed." According to Le Leux, the remaining approximately 50 feet of the 90 foot "scrap liner" was discarded; the 110 foot mold was constructed from June, 1992 through October, 1992; Swiftships has made three 110 foot fiberglass CMV hulls from the 110 foot mold for Egypt; the 90 foot mold was returned to Reingold after it was used to build the two RSVs for the United States Navy.

In opposition to Swiftships's motion for summary judgment, Reingold filed the affidavit of William G. Preston, a naval architect, and the deposition of Billy Wayne Sproles, the individual at Accurate Fiberglass, Incorporated charged with making the 110 foot mold.

Preston stated that he had been retained as an expert in naval architecture by Reingold, he had inspected the "90' female fiberglass mold, a 110' male mold, and design documents relating to the 90' vessel hulls and 110' vessel hulls constructed by Swiftships." Preston concluded that "the shape and dimensions of the first 40-45 feet of both molds are very similar and I believe it very likely that the 110' mold is derived from or is a modification of the 90' mold." Preston further stated that "the design document produced by Swiftships . . . is <u>not</u> the correct design drawing for the 110' mold. The bow portion depicted in the drawing has a much more rounded shape than observed on the 110' mold."

In his deposition, Sproles, the individual at Accurate Fiberglass, Incorporated charged with making the 110 foot mold, stated that he was told by Swiftships to use the 40 to 45 forward portion of the 90 foot plug or test liner to form the forward section of the new 110 foot ship hull mold; that the forward portion of the 90 foot plug "became the hundred-and-ten-foot mold"; that the naval architects at Swiftships told him it was "not a prerequisite that the finished product match the dimensions that they had. They said, 'Fair it in. Make it look right;'" that in doing so he changed a portion of the forward section of the 90 foot plug two or three inches at the start of the keel or the forward forefoot area; and that the bracing inside the 90 foot plug was intended for a purpose other than a test because "it was pretty

substantial and it wasn't something that you would look at and consider it to be a piece of junk or something you were just going to build and throw away."

We conclude that Swiftships's summary judgment evidence does not demonstrate an absence of genuine dispute as to the material fact of whether Swiftships improperly used and substantially incorporated Reingold's 90 foot mold as the front end of its new 110 foot ship mold. On the contrary, Le Leux admitted that Swiftships used approximately 40 feet of the bow portion of the 90 foot plug taken from Reingold's 90 foot mold in the new 110 foot mold, although he contended that the bow section's shape and form were altered in the process. Preston presented evidence that tended to show that, contrary to Swiftships's assertion, the 110 foot mold had not been independently developed from design drawings, but had been derived from or was a modification of the hull or plug taken from the 90 foot mold. Sproles's deposition indicated that Swiftships had never intended to scrap the 90 foot plug pulled from Reingold's 90 foot mold, and that, after minor repairs and slight changes, the front 40 to 45 feet of the plug pulled from Reingold's 90 foot mold became the bow portion of the new 110 foot mold.

Reading the record in the light most favorable to the nonmoving party, we conclude that Reingold established the essential elements of his trade secret claim, viz., the existence

of a trade secret; the misappropriation of it by Swiftships; and the actual loss to Reingold caused by the misappropriation.

For purposes of testing the summary judgment motion, the record shows that Reingold's ship mold was a trade secret. First, it was a "device" that incorporated a "pattern, . . . method, technique, or process" for the construction of ship hulls. LA. R.S. 51:1431(4). The ship mold is a 90 foot fiberglass frame containing a cavity within which glass in fibrous form can be shaped into a ship hull. Previously, the mold had been used successfully and effectively to build two vessel hulls, one for a yacht and the other for a fishing vessel. Thus, the ship mold was a proven device that united in one matrix a fully developed and tested pattern, method, technique, and process for constructing a particular kind of ship hull.

Second, the ship mold "derive[d] independent economic value . . . from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use[.]" *Id.* § 1431(4)(a). Originally, it had cost $1 million and had taken nine months to construct the 90 foot ship mold. Consequently, it would have been extremely expensive and time consuming for anyone to duplicate the mold through independent designing, planning, and construction or by reverse engineering. Swiftships's agreement to pay $145,000 per vessel for using the mold in building two initial vessels, and $20,000 for its use in building each subsequent vessel, cogently

indicates that the mold derived independent economic value from not being generally known to and not being readily ascertainable by proper means by other persons.

Finally, the summary judgment evidence indicates that Reingold exerted efforts that were "reasonable under the circumstances to maintain its secrecy." *Id.* § 1431(4)(b). The LUTSA requires a party to take reasonable measures to maintain relative, not absolute, secrecy. *Id.*; *Sheets*, 849 F.2d at 183; *see also* RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 39 (1995) (evidence probative of secrecy includes "[p]recautions taken by the claimant to preserve secrecy, the willingness of licensees to pay for disclosure of the secret, unsuccessful attempts by the defendant or others to duplicate the information by proper means, and resort by a defendant to improper means of acquisition."). Reasonable use of a trade secret including controlled disclosure to employees and licensees is consistent with the requirement of relative secrecy. LA. R.S. 51:1431 comment (f).

According to the summary judgment record, during his ownership of the mold Reingold maintained exclusive control and did not disclose it to or allow its use by anyone prior to leasing it to Swiftships. Before allowing its use by Swiftships, Reingold entered a written lease with the company providing that the mold would be used exclusively by Swiftships, any movement of the mold from lessee's shipyard would be contingent upon Reingold's prior approval, the lessee would give advance written notice to lessor

before using the mold in the construction of each vessel hull, the lessee would have exclusive and non-transferrable use of the mold, the lessee would not assign or transfer any interest in the mold, and the lessee, at the conclusion of the lease, would turn over all copies of the design data for any modifications made to the mold.

It reasonably can be inferred that Swiftships misappropriated Reingold's trade secret by acquiring and using it, through improper means, for a purpose to which Reingold did not expressly or impliedly consent. *Id.* § 1431(b)(i),(ii). Swiftships entered a contract with the Egyptian government to construct three 110 foot coastal minehunting vessels ("CMVs"). A reasonable trier of fact could find that, Swiftships, without notifying Reingold or obtaining his express or implied consent, improperly used the male hull or plug made from the 90 foot mold to fashion a 110 foot male ship mold to make hulls for the Egyptian vessels. Swiftships admits that it has constructed three CMV hulls using the 110 foot mold. Swiftships also admits that it made use of the front 40 to 45 feet of the male hull or plug in forming the bow portion of the 110 foot mold. Swiftships did not compensate Reingold for the use of his ship mold in making the 110 foot ship mold or in constructing any of the 110 foot CMV hulls for the Egyptians. Swiftships terminated its lease of Reingold's 90 foot ship mold, but Swiftships has not turned over the 110 foot mold, which it reasonably may be inferred is a modification or a derivative of the 90 foot mold. Drawing reasonable inferences from the record in the

-14-

light most favorable to the nonmovant, Reingold, we conclude that Swiftships misappropriated the trade secret, viz., Reingold's 90 foot ship mold together with its inherent pattern, method, technique, and process.

As we noted above, Swiftships's evidence that it changed the shape and pattern of the bow portion of the 90 foot hull or plug before using it to form the bow portion of the 110 foot mold merely creates a disputed issue of fact. Moreover, "'the user of another's trade secret is liable even if he uses it with modifications or improvements upon it effected by his own efforts, so long as the substance of the process used by the actor is derived from the other's secret.'" *Mangren Research & Dev. v. National Chem. Co.*, 87 F.3d. 937, 944 (7th Cir. 1996) (quoting *In re Innovative Constr. Sys., Inc.*, 793 F.2d 875, 887 (7th Cir. 1986)). "[I]f the trade secret law were not flexible enough to encompass modified or even new products that are substantially derived from the trade secret of another, the protections that the law provides would be hollow indeed." *Id.* (citing *Innovative Constr.*, 793 F.2d at 887; *American Can Co. v. Mansukhani*, 742 F.2d 314, 329 (7th Cir. 1984)). As the Supreme Court remarked in dealing with the analogous problem of patent equivalents, "Outright and forth right duplication is a dull and very rare type of infringement." *Graver Tank & Mfg., Co. v. Linde Air Products, Co.*, 339 U.S. 605, 607 (1950). These precepts are evident in the LUTSA and have been derived by courts interpreting and applying virtually

identical uniform trade secrets statutes.  Although Louisiana cases have not yet precisely articulated these principles, we think the Louisiana courts would adopt them in keeping with the legislative mandate that courts apply and construe the LUTSA to effectuate its general purpose to make uniform the law with respect to trade secrets among the states enacting the Uniform Trade Secrets Act. LA. R.S. 51:1438.

Under the LUTSA, a party proving trade secret misappropriation is entitled to recover the "actual loss caused by [the] misappropriation," as well as any "unjust enrichment . . . not taken into account in computing damages for actual loss." *Id.* § 1433.  It reasonably may be inferred that Reingold has suffered actual loss and that Swiftships has been unjustly enriched because of the misappropriation.  Swiftships has used the 110 foot ship mold to build three fiberglass hulls for CMVs.  Swiftships has refused to compensate Reingold for these uses.  Therefore, a reasonable trier of fact could easily conclude that Reingold has lost not only the substantial compensation to which he is entitled under the lease but also that he will suffer an indeterminate amount of future damages because of Swiftships's continued exploitation of the misappropriated mold.

Finally, Swiftships contends that Reingold's mold cannot be a trade secret, arguing as follows:

> Under Louisiana law, the complained of activity is not
> prohibited, because the hulls made from Reingold's mold were

in the public domain and under the Louisiana Uniform Trade Secrets Act, the requirement of a secrecy is therefore not met.  Swiftships, or anyone else, could have and still can take one of the five known 90' hulls made from the mold and, using the direct molding process described in <u>Bonito Boats</u> case, create another mold to make additional hulls.  As stated by the United States Supreme Court, this is a perfectly legitimate method of competition, and therefore, necessarily is legitimate under the Louisiana Uniform Trade Secrets Act.  Any suggestion that it is not legitimate is in conflict with Louisiana Uniform Trade Secrets Act, and is in conflict with federal patent law.

(Appellee's Brief p. 29-30).

There are several flaws in Swiftships's argument.  First, Swiftships assumes as a premise for its reasoning that hulls made from Reingold's mold are in the public domain, but there is no basis in the record for that proposition.  Public domain is a legal concept.  *Mine Safety Appliances Co. v. Electric Storage Battery Co.*, 405 F.2d 901, 902 n.2 (C.C.P.A. 1969).  Matter is in the public domain only if no intellectual property law, such as patent, copyright, or trade secrets, protects it.  *Id.*; 1 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 1:2 (4th ed. 1997).  Swiftships apparently relies on the fact that one or two vessels were made from the mold and were sold to third parties.  This fact

alone, however, does not demonstrate that Reingold had no protectable intellectual property right in the 90 foot mold.

Second, assuming arguendo that the pre-existing hulls were in the public domain, the mold itself may still be a trade secret. *See Phillips v. Frey*, 20 F.3d 623, 629 (5th Cir. 1994)(applying Texas law and holding that a process for manufacturing a product can be a trade secret even if the product is not). To be a trade secret a thing need only derive independent economic value from not being generally known or readily available to others who can obtain economic value from its disclosure or use. LA. R.S. 51:1431(4)(a). As established above, it reasonably may be inferred that the 90 foot mold has requisite secrecy to be a trade secret.[2]

Finally, Swiftships's contention, even if true, that it could have reverse engineered a mold from an existing hull is beside the

_____

[2]     Swiftships's arguments based on *Bonito Boats v. Thunder Craft Boats* are inapposite. The Supreme Court in *Bonito Boats v. Thunder Craft Boats* reaffirmed its holding in *Kewanee Oil Co. v. Bicron* Corp., 416 U.S. 470 (1974), which made it clear that federal patent law does not preempt state trade secret law. 489 U.S. 141, 165-66 (1989). Specifically, the Court stated that:
> In *Kewanee*, we found that state protection of trade secrets, as applied to both patentable and unpatentable subject matter, did not conflict with the federal patent laws. In both situations, state protection was not aimed exclusively at the promotion of invention itself, and the state restrictions on the use of unpatented ideas were limited to those necessary to promote goals outside the contemplation of the federal patent scheme. Both the law of unfair competition and state trade secret law have coexisted harmoniously with federal patent protection for almost 200 years, and Congress has given no indication that their operation is inconsistent with the operation of the federal patent laws.

*Id.*

point.  While state trade secret law cannot bar reverse engineering or independent discovery,  *Kewanee Oil Co. v. Bicron* Corp., 416 U.S. 470, 489-90 (1974), protection will be accorded to a trade secret holder against disclosure or unauthorized use gained by improper means, even if others might have discovered the trade secret by legitimate means. *See* LA. R.S. 51:1431 comment (a)(2)("The acquisition of the known product must of course, also be by fair and honest means, such as purchase of the item on the open market for reverse engineering to be lawful."); *see also* RESTATEMENT (THIRD) OF UNFAIR COMPETITION at § 39 comment f.

### B.

Reingold also asserts a cause of action under the Louisiana Unfair Trade Practices Act (LUTPA), La. R.S. 51:1401-1418.  That statute declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce[]." *Id.* § 1405(A).  The LUTPA further provides that "[a]ny person who suffers any ascertainable loss of money or movable property, corporeal or incorporeal, as a result of the use or employment by another person of an unfair or deceptive method, act or practice declared unlawful by R.S. 51:1405, may bring an action individually but not in a representative capacity to recover actual damages." *Id.* § 1409(A).  "The real thrust of the LUTPA, modeled after the Federal Trade Commission Act, 15 U.S.C. § 45, is to deter injury to competition." *Omnitech Int'l, Inc. v. Clorox*

*Co.*, 11 F.3d 1316 (5th Cir. 1944)(citing *Federal Trade Comm'n v. Raladam, Co.*, 283 U.S. 643 (1931)).

The LUTPA leaves particular determinations of what is an "unfair or deceptive method, act or practice" largely to the courts to decide on a case-by-case basis. *Marshall v. Citicorp Mortgage, Inc.*, 601 So. 2d 669, 670 (La. Ct. App. 5th Cir. 1992); *Roustabouts, Inc. v. Hamer*, 447 So. 2d 543, 548 (La. Ct. App. 1st Cir. 1984); *Omnitech*, 11 F.3d at 1332; *Turner v. Purina Mills, Inc.*, 989 F.2d 1419, 1422 (5th Cir. 1993). The Louisiana courts have interpreted these terms to include "'a practice that is unethical, oppressive, unscrupulous, or substantially injurious,'" *Bolanos v. Madary*, 609 So. 2d 972, 977 (La. Ct. App. 4th Cir. 1992) (quoting *Moore v. Goodyear Tire and Rubber Co.*, 364 So. 2d 630, 634 (La. Ct. App. 2d Cir. 1978)); fraud, misrepresentation, deception, but not mere negligence, *Marshall*, 601 So. 2d at 670-71; acts offensive to established public policy and immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, *Monroe Med. Clinic, Inc. v. Hospital Corp. of Am.*, 622 So. 2d 760, 781 (La. Ct. App. 2d Cir. 1993); and acts having some element of fraud, misrepresentation, deception or other unethical conduct, *Dufau v. Creole Eng'g, Inc.*, 465 So. 2d 752, 758 (La. Ct. App. 5th Cir. 1985). On the other hand, "the statute does not provide an alternate remedy for simple breaches of contract," *Turner*, 989 F.2d at 1422 (citing *State v. Orkin Exterminating Co.*, 528 So. 2d 198, 202 (La. Ct. App. 4th Cir. 1988)); or "prohibit sound business

practices, the exercise of permissible business judgment, or appropriate free enterprise transactions." *Id.*; *Omnitech*, 11 F.3d at 1332. Significantly, however, under the LUTPA the Louisiana courts appear to zealously guard against allowing managers, employees, and persons in a special position of trust to profit from their wrongdoing. *Turner*, 989 F.2d at 1422 (citing as an example *National Oil Serv. of Louisiana v. Brown*, 381 So. 2d 1269 (La. Ct. App. 4th Cir. 1980)); *see also Roustabouts*, 447 So. 2d 543; *Dufau*, 465 So. 2d 752; *Potvin v. Wright's Sound Gallery, Inc.*, 568 So. 2d 623 (La. Ct. App. 2d Cir. 1990).

From the pleadings, depositions, affidavits and other evidence of record, we conclude that a reasonable trier of fact could find or infer that Swiftships intentionally defrauded Reingold by surreptitiously using his 90 foot mold to construct a third 90 foot hull or plug, which Swiftships used by modification or incorporation to create a new 110 foot mold; that the 110 foot mold was in substance derived from Reingold's 90 foot mold without his knowledge or consent; that Swiftships used the new 110 foot mold, without Reingold's knowledge or consent, to build 110 foot vessels for profit under contract with the Government of Egypt; that Swiftships has contracted with third persons to build additional vessels with the 110 foot mold; that Swiftships refuses to compensate Reingold for its surreptitious uses of the 90 foot mold and the 110 foot mold; that Swiftships terminated the lease and refused to turn over to Reingold the 110 foot mold; that this

-21-

constituted a intentional conversion of the 110 foot mold because that device was in substance a modification of the 90 foot mold; that Swiftships was obliged to turn over all such modifications both under the lease and by virtue of its relationship of trust as a licensee of Reingold; that Swiftships denies its fraud and concealment and intends to continue producing vessels with the 110 foot mold that it derived from the 90 foot mold without compensating Reingold.  Reingold specifically alleges that these deliberate acts of fraud and misappropriation constitute unfair trade practices under the LUTPA.  We agree.

Drawing inferences from the underlying facts contained in the materials in the light most favorable to the party opposing the motion for summary judgment, we conclude that Swiftships's acts were far more reprehensible than a mere breach of contract or a sound business judgment.  Cast in this light, Swiftships's conduct amounted to intentional deception, fraud, misrepresentation, and unethical conduct.  As Reingold's licensee, Swiftships was placed in a special position of trust with regard to Reingold's trade secret and should not be permitted to profit from its wrongdoing in misappropriating it and in refusing to turn over all molds and hulls derived therefrom.  Swiftships's intentional course of conduct in misappropriating and converting Reingold's trade secret constituted a pattern of unfair trade practices and wrongfully put Reingold at a severe competitive disadvantage.  Swiftships, by wrongfully misappropriating the substance of Reingold's ship hull

mold, deprived Reingold of his trade secret, eliminated itself as a potential customer of Reingold, and set itself up as Reingold's formidable competitor in the ship mold market. The loss to Reingold and the unjust enrichment to Swiftships are enhanced by the fact that Reingold's mold and the derivatives of it apparently have proved very valuable devices in the building of military ships for the United States and Egyptian navies.

Swiftships argues, however, that Reingold's LUTPA action is prescribed because Section 1409(E) provides that such an action "shall be prescribed by one year running from the time of the transaction or act which gave rise to this right of action." LA. R.S. 51:1409(E). It reasonably may be inferred, however, that at least one of Swiftships's violations of the statute occurred within the period of limitations. In May of 1994, shortly before the filing of this action in December of that year, Swiftships terminated the lease and converted the 110 foot mold that in substance had been derived from Reingold's 90 foot mold; Swiftships intentionally persists in the deception that its 110 foot mold was derived from independent plans rather than from Reingold's trade secret; and Swiftships fully intends to continue to unjustly enrich itself to the competitive disadvantage of Reingold. For purposes of summary judgment review, this course of intentional and fraudulent conduct was clearly a violation of the LUTPA. We need not decide on the sparse record before us whether this is a type of case in which (1) "the original violation occurred outside the

statute of limitations, but is closely related to other violations that are not time-barred," so that recovery may be had for all violations; or (2) "one in which an initial violation, outside the statute of limitations, is repeated later;  in [which] case, each violation begins the limitations period anew, and recovery may be had for at least those violations that occurred within the period of limitations." *Hendrix v. City of Yazoo City, Miss.*, 911 F.2d 1102, 1103 (5th Cir. 1990).  If necessary, the legal decision of whether the case fits in either of these categories, or perhaps in an entirely different class, may be decided best with the benefit of a full record.  In any event, Reingold's LUTPA claim should not have been dismissed on summary judgment.

Because this matter is before us following a grant of summary judgment, however, we make no intimations regarding the correctness vel non of either party's factual assertions or the final outcome after a trial on the merits.  *Rankin v. Klevenhagen*, 5 F.3d 103, 108 (5th Cir. 1993).

For the reasons assigned, the District Court's judgment is **REVERSED** and the actions are **REMANDED** for further proceedings consistent with this opinion.


E. GRADY JOLLY, Circuit Judge, concurring in part and dissenting in part:

I join in the court's opinion with respect to parts I, II, III, and IV.A. Because I am convinced that Reingold's LUTPA claim is prescribed by the statute of limitations, however, I respectfully dissent from part IV.B.

The statute provides that any claim under the LUTPA "shall be prescribed by one year running <u>from the time of the transaction or act which gave rise to th[e] right of action</u>." La. Rev. Stat. Ann. § 51:1409(E) (emphasis added). Here, the wrongful act that gave rise to the LUTPA claim was when Swiftships misused a portion of the 90' plug to create the 110' mold. Because the 110' mold was completed more than two years prior to Reingold's bringing his suit, the LUTPA claim is barred under the clear terms of the statute. The termination of the lease on the 90' mold one and a half years later, itself a perfectly valid exercise of contractual rights, is entirely irrelevant to the LUTPA claim.

The majority says that the termination of the lease was itself a wrongful act, inasmuch as it amounted to a "conversion" of the 110' mold. It argues that the entire 110' mold was a "modification" of the 90' mold under the lease between Reingold and Swiftships, and that Swiftships was required to turn it over to Reingold upon terminating the lease. Because Swiftships failed to do this, it in effect "converted" the mold to its own use, and this act gave rise to a cause of action under the LUTPA. Because the termination occurred within the prescription period, the majority concludes that the LUTPA claim is not barred.

This holding[3] is plainly mistaken, as it depends on a distorted reading of the lease agreement that its words simply will not bear.  With regard to modifications, the sole clause in the lease was the following:

> Lessee may modify the Mold as it desires in order to meet the design requirements of its contracts but at the conclusion of this Agreement, Lessee shall promptly turn over to Lessor copies of the design data for any modifications made to the Mold and Lessor shall have the right to use the mold as modified.

Looking closely at the plain language of this provision, and noting in particular the phrases "modifications made to the Mold" and "right to use the mold as modified," it seems quite clear that this clause speaks only of minor modifications made to the physical substance of the 90' mold itself, not derivations of the 90' mold's design.  My impression accords with Webster's, who defines modification as "the making of a limited change in something." Webster's Seventh New Collegiate Dictionary (Merriam 1963) (emphasis added).  The making of the 110' mold was neither a limited change nor a change "in" the 90' mold.  As such, the 110' mold was not a modification of the 90' mold, and there was no contractual duty with regard to it upon termination of the lease. The termination was therefore in no way a wrongful act which could give rise to a cause of action under the LUTPA, and consequently it

---

[3]**We should not be misled by the majority's phrasing of the issue as something a reasonable trier of fact could find.  This is a simple matter of contract interpretation, and entirely within the province of this court to decide as a matter of law.**

is irrelevant for purposes of considering the statute of limitations.

I therefore respectfully dissent from the majority's holding that the LUTPA claim is not barred by the statute of limitations.